# WHEELING.

Exchange Bank of Virginia *v.* County of Lewis.

Submitted June 29, 1886.—Decided July 7, 1886.

| 28 | 273 |
| --- | --- |
| 33 | 784 |
| 28 | 273 |
| 34 | 372 |
| 28 | 273 |
| 46 | 484 |

| 28 | 273 |
| --- | --- |
| 53 | 435 |

In 1854 the county court of Lewis county by an order entered of record having determined to build a new court-house and clerk's office, the cost of which was to be paid in four equal annual instalments, contracted for the erection thereof on the terms aforesaid. In December, 1854, said court appointed J. B. its agent to borrow the money necessary to meet the engagements of the county with its contractors and pledged the county for the payment thereof. J. B. borrowed from the Exchange Bank of Virginia $4,075.04 for that purpose, for which he made to the bank four negotiable notes, whereby he promised to pay the same to the bank one hundred and twenty days after their respective dates, and signed the same, "J. B., Agent for Lewis county." In an action brought by the bank against Lewis county to recover the amount of this loan, HELD :

I. The said notes were the notes of J. B. and not the notes of Lewis county. (p. 293.)

II. The county court of Lewis county had no authority to execute negotiable notes for any debt due by the county. (p. 296.)

III. The power conferred upon the county courts of the several counties of Virginia by the provisions of ch. 53 of the Code of 1849 to provide for the payment of all sums lawfully chargeable on the counties, which ought to be paid within the year, out of the county levies, which they were required to make annually, prohibited them from raising the money necessary for that purpose in any other way. (p. 292.)

IV. The county courts of Virginia in 1855 and 1857 had no power or authority to borrow money for the erection of court-houses or other public buildings for the use of their several counties. (p. 291.)

V. The action of Lewis county in borrowing money for the erection of its court-house in 1857 was not only unauthorized by law, but it was in effect prohibited by the laws then in force. (p. 296.)

VI. The borrowing of said money and the making of said negotiable notes, so far as Lewis county was concerned, were acts *ultra vires*, and incapable of ratification. (p. 290.)

VII. No action against Lewis county to enforce the collection of the money so borrowed can be maintained. (p. 296.)

*E. Maxwell* and *J. Brannon* for plaintiff in error.

*M. M. Gilliam* and *J. M. Bennett* for defendant in error.

WOODS, JUDGE :

This was an action of *assumpsit* brought in the circuit court of Lewis county in 1859 by the Exchange Bank of Virginia against Lewis county, to recover the sum of $4,075.04; being the amount of four negotiable notes made in 1857 by James Bennett, agent for Lewis county, payable in one hundred and twenty days after their respective dates. All of them were in the following form :

"One hundred and twenty days after date I promise to pay to the order of Exchange Bank of Virginia for value received five hundred dollars negotiable and payable without offset at the office of discount and deposit of the Exchange Bank of Virginia in Weston. Credit the drawer.    "JAS. BENNETT,
                                    "Agent for Lewis county."

The declaration contained the common counts for money loaned to James Bennett, agent for the defendant, for and on behalf of the defendant and at its request; for money loaned to the defendant at its request; for money paid to James Bennett for the use of the defendant at its request, and for money found to be due from the defendant to the plaintiff upon an account stated between them ; and also a special count founded on said four negotiable notes, with the averments that the notes were executed by James Bennett as the agent of Lewis county whereby he promised as such agent to pay the moneys specified therein to the plaintiff ; that said James Bennett was authorized and duly empowered by the defendant to make said notes on behalf of said county ; and that they were so drawn on behalf of the defendant and for the use of the defendant; and that the defendant received the value thereof, to-wit: the sum of $4,075.04 alleging that the plaintiff by the non-payment thereof has sustained damages to the amount of $6,000.00. The plea was *non assumpsit*, and the issue was by consent of parties tried by the court in lieu of a jury on January 8, 1886, upon an agreed statement of facts and other facts set forth in the bill of exceptions, when the circuit court rendered judgment in favor of the plaintiff against the defendant for $10,972.58 with interest from January 8, 1886, until paid and costs. The defendant moved to set aside the finding and judgment of the court, which motion was overruled, and the defendant excepted and

filed its bill of exceptions, whereby the court certified all the evidence, which was before the jury.

To this judgment the defendant has obtained a writ of error and *supersedeas.*

The real nature of this controversy is disclosed by the agreement of facts. They are as follows: The county court of Lewis county on July 10, 1854, all the acting justices of the county having been summoned to attend that term to consider the propriety of doing so, and a majority of all the acting justices being present and concurring therein, determined to erect a new court-house and clerks' offices for the use of said county, to be paid in four equal instalments payable in one, two, three and four years, and then and there appointed on the part of the county three commissioners named in the order, "to procure a suitable plan and specifications for said buildings, and to enter into contract for their erection, to be paid for in instalments as aforesaid."

The court on November 16, 1854, accepted certain of the proposals returned by the commissioners and awarded the work accordingly, and ordered them to enter into contract with the parties, to whom the work had been awarded, for and on behalf of the county and to take bonds from the contractors for the faithful performance of their contract, all of which was done, and the plans and specifications and the bonds of contractors for building the new court-house and clerk's offices were afterwards at a court held for said county on January 9, 1855, presented to and received by the court and ordered to be filed.

"At a county court held for the county of Lewis on December 13, 1854, all the acting justices of the county having been summoned in pursuance of an order entered at the last term of this Court, and a majority of all the justices of the county being present, and it being essential for the compliance with the terms of certain contracts entered into for the location of a court-house for the county and other public buildings that the county should borrow for a limited time money to meet its engagements with the contractors, the court therefore appoints James Bennett their agent to borrow so much money and in such sums as may be requisite within the limitations of their contracts respectively and the orders of said court

heretofore made, to be paid in semi-annual instalments or such shorter period as may be found necessary to meet the engagements of the county under the contracts aforesaid, and any such contracts or other endorsement which may be made by such agent for and on behalf of the county, shall be binding upon it in its corporate capacity ; and the court declares that the county shall fulfil its engagements in the payment of the money which may be borrowed as aforesaid ; but no note or other paper shall fall due at other time or times than on the 15th of June and December in each year, or near those times; and to effect the loan aforesaid the agent shall apply first to The Exchange Bank of Virginia at Weston."

The county court of Lewis county by an order made on October 8, 1855, ordered, that as often as any of the contractors for the construction of the court-house shall be entitled to an estimate in pursuance of his contract, the superintendent shall give him an estimate and certificate specifying the amount due and for what services rendered, and declared that such certificate should be evidence of debt, and entitle the contractor to the money mentioned therein, and upon the production thereof to the agent, who is authorized to borrow money, he shall pay the same out of any money under his control by levy, and if there be none such, he shall borrow the amount necessary to pay off such estimate in the manner heretofore directed ; that the said agent should keep an account of all drafts presented to him for payment and of his payments thereon, distinguishing between the principal and interest of all sums borrowed, and that the sum of $2,000.00 levied at the last June term of said court should be paid over to said James Bennett, the agent therefor appointed by the sheriff of Lewis county at the time prescribed by law.

James Bennett acting as agent for the county of Lewis executed the notes in the declaration mentioned for the purpose of having them discounted, and they were discounted by The Exchange Bank of Virginia as a loan for the purpose of applying the proceeds on contracts for the erection of a court-house for said county. By the agreement of facts it appears that the defendant was authorized to prove any pay-

ments to which it might be entitled. All the notes mentioned in the declaration were read in evidence, and all were negotiable, in form identical with the $500.00 note, but for different amounts.

Thus it appears, that while the county court of Lewis county had in the manner prescribed by law determined to build a court-house and clerks' offices and to provide for the payment thereof in four equal annual instalments and had so contracted with its workmen and had actually levied one instalment of $2,000.00 for that purpose, it undertook to appoint an agent to borrow as much money and in such amounts, as might be needed by the county within the limitations of its contracts and the orders of the court therefor made, and undertook to pledge the credit of the county for the payment of the moneys so to be borrowed; and that the moneys specified in the notes mentioned in the declaration are moneys so borrowed by James Bennett, for that purpose.

The following grounds of errors are assigned by the plaintiff in error:

In rendering any judgment against Lewis county.

In not rendering judgment in favor of the defendant.

In refusing to set aside the judgment and grant a new trial.

And for other errors appearing in the transcript of the record.

The counsel for the plaintiff in error in their argument insist upon three propositions:

First.—The county court of Lewis county had no power to borrow money for the purpose of erecting its court-house.

Second.—The county court of Lewis county had no power or authority to execute negotiable securities for the payment of any of its debts.

Third.—The county court having no power or authority to borrow money, all of its acts in doing so are void.

Fourth.—The county of Lewis did not borrow the money nor execute the notes in the declaration mentioned.

Fifth.—The notes sued on are the notes of James Bennett, and not the notes of Lewis county.

The counsel for the defendant in error insist in argument

on the converse of these propositions, and that, even if the county court of Lewis county did not have the power to borrow money and to execute negotiable notes therefor, yet if the county actually received the benefit of the money so unlawfully obtained, it ought in equity and good conscience to be held liable for and be compelled to pay the same.

The exhaustive arguments of the distinguished counsel on both sides have left this Court little to do, except to examine the cases cited in their briefs. All of these accessible to us have been carefully examined, and we have not hesitated to devote to this duty all the labor, which such an examination necessarily imposed, although it resulted in showing that many of the cases had none at all, and others very little bearing upon the narrow question involved in this inquiry, viz: whether under the laws of Viginia, as they existed in 1857,—the counties of Virginia, or rather their several county courts, for they could only act through the county courts, possessed the general powers to borrow money without special authority given by the General Assembly for that purpose.

Many of the cases cited by the counsel for the plaintiff in error, and nearly every one of those cited by the counsel for the defendant in error, in reference to the powers of corporations to borrow money and to execute negotiable notes as securities therefor relate either to private corporations such as railroad companies, insurance companies, manufacturing and banking companies, or to such municipal corporations as cities, towns and villages, but not to counties. In all these cases, where the validity of any debt contracted or incurred by such private or municipal corporation has been called in question, the principal inquiry has been : Was the debt incurred in the prosecution of the legitimate business of the corporation and within the general scope of its authority ; or if its powers in the particular instance have been exceeded, has the act been subsequently ratified by the corporate body or by the individual stockholders, if the same was capable of ratification ?

The tendency of the courts, indicated by an almost unbroken line of decisions, is to hold corporations, private

and municipal, to a strict compliance with their contracts, where the same are neither *malum in se* nor *malum prohibitum*. We have been unable to find any reported case, where it has been held, that a county in the absence of authority express or clearly implied has a general authority to borrow money, with which to defray its general expenses, where the law imposing the duty of providing for the payment of county expenditures has given the county ample power of taxation to enable it to do so.

Assuming, that every county in Virginia in 1855 and 1857 was invested with and might exercise some *few* of the functions of a municipal corporation, we will discover by a careful examination of the legislation of Virginia from a very early day in its history, that, while the county courts have always and justly been regarded with great favor as fiscal agents of the several counties, their powers have been restricted within narrow limits, which up to the creation of West Virginia had been but very little enlarged. They were composed of all the justices of the peace in the several counties; every section of the county had its representative upon the bench in the person of the justice of the peace of that district; no claim however small could be allowed and ordered to be paid except by the vote of a majority of all the justices of the county or a majority of those present, when all had been personally summoned to attend court for the purpose of ascertaining what were the liabilities of the county, which ought to be paid within the year; and these were all required to be levied for and paid within six months afterwards. If the amount of a creditor's demand was allowed, the sheriff was required to pay the same to him, and unless so paid he and his sureties were liable therefor upon his official bond, and there could be no defaulting treasurers.

By sec. 13, ch. 37, Rev. Code 1792 it was enacted, that "from that time forth hereafter the court of every corporation and county within this commonwealth shall cause to be erected and kept in repair within each respective county and corporation at the charge of such county or corporation a good and convenient court-house and jail for the use of their county or corporation, and for no other use whatever."

This provision was re-enacted without change in sec. 16, of ch. 71, of the R. C. 1819. The same provision in substance was re-enacted in sec. 1 of ch. 50, of the Code 1849: "There shall be provided by the court of every county, and by the council of each town, wherein there is a corporation-court, a court-house, clerk's office and jail, the cost whereof and of the land on which they may be, and keeping the same in good order shall be chargeable to the county or corporation, and may be levied for by such court or council. But no county court shall make any order for the purchase or condemnation of such land, or the erection of a court-house unless a majority of the acting justices of such county be present at the time or unless the acting justices of such county shall have been summoned to attend at that time to consider the subject, under an order made at a previous term." The same provision was carried into the edition of the Code published in 1860.

By sec. 7, ch. 134 R. C. 1792 it was enacted that "The justices of the several counties within this commonwealth, shall and they are hereby authorized at their courts respectively to be held in the months of June or July annually, or as soon after as may be, if no court be held in either of those months, to proceed to make up in their minutes an accurate account of all expenses incurred by the said court under authority of any law chargeable on the county and remaining unpaid, stating therein the sums due, for what and to whom due, and all credits owing to said county. When the balance due from the county is thus ascertained by deducting the sums due to the county from those owing by the county, the said justices shall proceed to levy and assess on the titheable persons in their respective counties the amount of that balance in equal portions. The sums due the county, and the sum to be assessed on the titheables being added together shall then be appropriated by the court, so as to show the right of each county creditor, and the amount of his demand."

This provision was carried into sec. 6, ch. 191, R. C. 1819, with a proviso, that to authorize such a levy, a majority of all the justices of the county must be present at the time, or unless the court shall have signified its intention to lay such

levy by entering the same upon its records at least one month previous with directions to the sheriff to summon the justices to attend the next term for that purpose. This section was carried into the Code of 1849, sec. 3, ch. 53. By the first section of ch. 53, it is declared that "so much of every county as is without the limits of a town that provides for its own poor, and keeps its streets in order, shall be levied upon by the court of such county to raise the money with which the county is chargeable." While by the Codes of 1792 and 1819 this levy is charged in equal amounts, as a poll-tax upon all male persons over the age of sixteen years and on all female slaves in the county above that age, sec. 4 of ch. 53 of the Code of 1849 authorized the county court with the consent of a majority of all the justices of the county to lay the said levy on all free male persons over the age of sixteen years and on all slaves and other property assessed with State-taxes within the county and without the limits of a town, which provides for its own poor and keeps its streets in order, in which case the order for the levy shall be for a certain sum on each free male person over the age of sixteen years and on all other subjects for a certain *per cent.* upon the amount of taxes thereon.

By sec. 9, ch. 134, R. C. 1792, and by sec. 8, of ch. 191, R. C. 1819 it is provided, that every sum, the payment whereof shall have been directed out of the levy, shall be paid by the sheriff or collector within six months after the date of such order to the person, to whom such payment is directed; and in default of such payment the party entitled to the money may recover judgment in the court of such county for the same against the sheriff or collector and his sureties upon ten days' notice. By sec. 15, ch. 53, Code 1849 any such party not so paid was authorized in like manner to recover the same by motion in the county or circuit court of such county for the amount due with interest, from the time the same ought to have been paid—and damages in addition thereto not exceeding fifteen *per cent.*, as the court might deem proper.

From this examination of these provisions of the Codes of 1792, 1819, 1849 and 1860 it is apparent, that, while the General Assembly of Virginia imposed upon the county

36

courts of the several counties the duty "from time to time forever thereafter" to cause to be erected and kept in repair within each respective county a court-house, clerk's office and jail, and also to provide for the payment of all other amounts chargeable upon the county, it clothed them with ample authority to raise the money necessary for that purpose by vesting in them an almost unlimited power of raising money by taxation levied upon every titheable of the county in a manner best calculated to arouse public attention as well to the amount demanded as to the persons receiving the same and the uses, to which it was to be applied.

Required by law at the regular terms of the county courts held in the month of June or July in every year to make up and enter upon its records in the presence of a majority of all the justices of the county, or of those present when all have been previously summoned to be present for that purpose, an account of all sums lawfully chargeable on the county, which ought to be paid within one year, stating how much, to whom and for what such payment is to be made, and then charging the same in equal portions upon each of the titheables of the county, there remains neither necessity nor excuse for raising money in any other mode for any legitimate purpose. If this mode of raising money was burdensome or unjust to any, it had the virtue of being certain and expeditious, while at the same time it was an effectual restraint upon ill advised and reckless expenditure of the people's money. By this mode the whole amount of the levy for all purposes, chargeable on the county and payable within the year, was at once appropriated to the several county creditors, before a single dollar of it could be collected, every one of whom knew, that he was entitled to be paid within six months from the date of the order laying the county levy, and that in case the sheriff or collector failed to pay the same within that period, the creditor's remedy was adequate and expeditious. This mode of providing for the payment of all county charges practically operated to remove every temptation to involve the counties in debt by rendering it impracticable to expend public money for unnecessary, useless or injudicious purposes, inasmuch as every proposed expenditure was necessarily exposed in the first instance to

the scrutiny of all the justices of the county, and then if allowed, was made a matter of public record accessible to all the tax-payers of the county, and, if the same was found to be unauthorized by law, the whole levy was liable to be superseded within forty days thereafter upon the petition of any twenty-four persons interested in reversing the same.

From these considerations it would seem, that the idea of the county courts raising money in any other mode, and especially by borrowing the same, never entered the legislative mind. It may be admitted without impairing the force of these objections, that circumstances might arise, when the county court of a particular county might deem it convenient and desirable to anticipate the future revenues of the county to meet extraordinary expenditures unnecessarily or injudiciously incurred. But however this may be, the limited power vested in the county court to raise money in the mode prescribed by law can not be supplemented or enlarged by such improvidence. On the contrary the possibility, that such reckless expenditure may be made, is a cogent reason why the power of borrowing money has been withheld from the county courts. The power already granted of raising money by taxation was ample for the purpose of erecting and keeping in good repair at the expense of the county a court-house and clerk's office, and if the particular mode of raising money for these purposes prescribed by the statute be departed from for the purpose of building a court-house, by what means could the county court be restrained from borrowing money to keep the same in good repair or for the purpose of paying other lawful county charges? The policy of the law of Virginia was to keep the counties out of debt, to compel them "to pay as they go," and to charge the county revenues of each year with its own burdens.

The correctness of this view of these statutes is sustained by the fact, that no cases in Virginia have been cited by counsel, nor have our own researches furnished any, where the county court of any county in the absence of special legistation has ever undertaken to borrow money for the purpose of erecting its court-house or other public buildings.

The construction placed on these statutes by the General

Assembly of Virginia has been in accord with the views we have presented.

By an act passed April 3, 1839, and amended by act passed March 5, 1840, the county court of Monongalia county was authorized to borrow not exceeding $10,000.00 for the building of bridges and making other improvments within the county for the public benefit, and to provide for the payment thereof either by means of an assessment upon real property or by levy or by both at their discretion.

By a similar act passessed March 23, 1839, the county court of Green county was authorized to borrow money on the credit of the county not exceeding $8,000.00 for the purpose of defraying the expenses already or thereafter to be incurred for the erection of the public buildings of said county, and making it the duty of that court to lay a sufficient levy for the payment thereof with interest at the periods, when the same should become payable, and declaring that such levy or levies may be collected in the mode now prescribed by law in other cases.

A similar act was passed March 15, 1851, after the Code of 1849 went into effect, authorizing the county court of Northumberland county, a majority of the acting justices of the county being present or having been summoned for that purpose, to borrow from time to time from banks or others on the credit of the county not exceeding $5,000.00 for the purpose of defraying in part the expenses of re-building the court-house of that county, and making it the duty of said court to lay a sufficient levy for the payment of the money borrowed with its interest at the times, when the same should become payable. (Acts 1850–51, ch. 31).

By a similar act passed 15th of March, 1858, the county court of Orange county was authorized to borrow a sum not exceeding $10,000.00, for the purpose of building a new courthouse for that county, with the same provision in regard to the presence and consent of a majority of the acting justices of the county. (Acts 1857–8, ch. 248).

By a similar act passed March 18, 1850, a short time before the Code of 1849 took effect, the mayor and commonalty for the corporation of the town of Danville were authorized to purchase as much land in said corporation as was

necessary to erect the court-house and other public buildings for said town, and to make their levies for the payment of said land and buildings in three several consecutive years, so as to make payment by annual instalments.

If in these instances the several county courts of the counties of Monongalia, Green, Northumberland and Orange, had already possessed the power to borrow money for the erection of their court-houses and bridges and for other public improvements, these several acts of the General Assembly would have been unnecessary.

While legislative construction is not conclusive upon judicial tribunals, yet the fact that no instance can be found since the adoption of the Rev. Code of 1792, where counties in the absence of special authority granted for that purpose have undertaken to borrow money for the construction of court-houses and other public buildings, and the further fact, that the General Assembly both before and since the enactment of the Code of 1849 has repeatedly by special acts conferred this power upon the county courts for certain specified purposes and for the especial purpose of constructing court-houses, furnish an argument strongly pursuasive, that the county courts did not otherwise possess and therefore could not lawfully exercise this extraordinary power of borrowing money for the purpose of erecting public buildings or making other public improvements in their respective counties.

It has been earnestly insisted in argument by the counsel for the defendant in error, that the county of Lewis was in some sense at least a municipal corporation, and that its corporate powers were in a great degree subject to the rules of construction applicable to private corporations, and that it may consistently in the line of its duties with safety to the public interests raise money, with which to pay the public charges, by borrowing for that purpose; in other words, that, whenever the county court should deem it more convenient to raise money, with which to defray the public charges, by borrowing the money instead of collecting the same by a county levy in the mode prescribed by law, it may safely disregard the law and raise the money required by borrowing the same, and that, it this power be not expressly

granted, it is one the existence of which may in this case be safely implied.

A corporation is described by Chief Justice Marshall, as "an artificial being, invisible, intangible and existing only in contemplation of law. Being the mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed to be best calculated to effect the object for which it was created." Municipal corporations are bodies politic and corporate of the general character above described established by law to assist in the civil government of the country. The distinction between municipal corporations proper, such as cities and towns whether created by special charters or by general laws, and involuntary *quasi* corporations, such as counties, is this : the former are called into existence by the consent of the persons composing them for the formation of their own local private advantage and convenience; while counties are at most local organizations, which for the purpose of civil administration are invested with a *few functions* of a *corporate* existence, created almost exclusively with a view to the policy of the State at large in the administration of justice, the support of the poor and the establishment and repair of public highways. The public statutes confer on them *all the powers* they possess, prescribe all the duties they owe, and enforce all the liabilities to which they are subject. As corporate bodies of limited powers they rank *very low* down in the grade of corporate existence, and hence they are often called *quasi* corporations. (1 *Dill. Mun. Corporations*, sec. 18, 25). In the construction of the powers, granted to them the courts adopt a strict rather than a liberal construction, the rule being, that, where any ambiguity or doubt exists arising out of the terms used by the legislature, it must be resolved in favor of the public.

Municipal corporations differ from private corporations only in the purposes of their creation. They are equally dependent for their existence and the powers, which they can exercise, upon the law of their creation. They are limited to the powers specifically granted and such other powers, as are necessary to carry into effect those granted. They can

exercise no others, and the plea of *ultra vires* may always be interposed as a defence to the enforcement of any contract or obligation not made within the prescribed limits of their powers, (see dissenting opinion of Justice Field concurred in by Chief Justice Chase and Grier and Miller J.J. in *Rogers* v. *Burlington*, 3 Wall. 668).

In the case of *Mead* v. *The Providence Ins. Co.*, 2 Cranch. 169, Marshall, Chief Justice, delivering the opinion of the court said : "The act of incorporation is to corporations an enabling act; it gives them all the powers they possess; it enables them to contract, and when it prescribes to them a mode of contracting, they *must observe that mode*, or the instrument no more creates a contract, than if the body had never been incorporated. (*Christie* v. *Malden*, 23 W. Va. 667; *Charleston* v. *Reed*, 27 W. Va. 681)."

In the case of *Claiborne county* v. *Brooks*, 111 U. S. 400, that county had incurred a debt of $5,000.00 to Sturm, a part of the price for erecting its court-house, and to secure the payment thereof had executed to him a "negotiable bond" for that sum, which he endorsed for value to a *bona fide* holder before its maturity, who brought his action thereon, against the county to recover the money specified therein. The recovery was resisted on the ground that the county had no authority to make a negotiable security. The laws of Tennessee declare, that "every county in the State is a corporation, and the justices in the county court are the representatives of the county and authorized to act for it." Among the duties imposed are the following : "It is the duty of the court to erect a court-house, jail and other necessary buildings; the county buildings are to be erected and kept in order and repair at the expense of the county under the direction of the county court, and it may levy a specified tax for that purpose." Judgment having been rendered for the plaintiff in the circuit court of the United States upon instructions, that the county had authority to execute the bond in controversy, the Supreme Court of the United States reversed the judgment, on the the ground that mere political bodies constituted as counties are for the purpose of local police and administration and having the power of levying taxes to defray all public charges created, whether they

are or are not formally invested with corporate capacity, have no power or authority to make and utter commercial paper of any kind, unless such power is expressly conferred upon them by law or clearly implied from some other power expressly given, which otherwise can not be exercised.

The same principle is announced by the Supreme Court of the United States, in *Police Jury* v. *Britton*, 15 Wall. 566, in *Ottaway* v. *Carey*, 108 U. S. 111, and in *The Mayor* v. *Ray*, 19 Wall. 468. In the last named case it was held, that "municipal corporations have not the power without legislative authority expressly given or clearly implied to borrow money; that such corporations are of a public character instituted for the purpose of local government and constitute part of the domestic government of the State; that the power of taxation is given to them for the purpose of raising the means of carrying on their functions, and that the creation of such special power is *exclusive of other powers.*"

The same court in 15 Wall. 566 held, that the trustees or representatives of a parish, county or other local jurisdiction with the usual powers of administration in specific matters and with the power of levying taxes to defray the necessary expenditures of the jurisdiction have no implied authority to issue negotiable securities payable in future of such a character as to be unimpeachable in the hands of *bona fide* holders for the purpose of raising money or funding a previous debt." Bradley, judge, delivering the opinion of the court in that case said : "It is one thing for county or parish trustees to have the power to incur obligations for work actually done in behalf of the county or parish, and to give proper vouchers therefor, and a totally different thing to have the power of issuing unimpeachable paper obligations which may be multiplied to an indefinite extent. If it be once conceded that the trustees or other local representatives of townships, counties and parishes have the implied power to issue coupon-bonds payable at a future day, which *may be valid and binding obligations* in the hands of innocent purchasers, there will be no end to the frauds that will be perpetrated.

The question, whether a municipal corporation in the

absence of a specific grant of power can borrow money was fully considered in the case of the town of *Hackettstown* v. *Swackhumer*, 37 N. J. Law. 191. Its charter gave to the town the usual prerogatives of administration, improvement and police and then declared, "that it shall be lawful for the common council from year to year to vote and raise by tax such sum or sums as they may deem necessary and proper." The town borrowed money, which was expended in behalf of the town for its legitimate purposes, and the treasurer of the town in the name of and on behalf of the town executed to the lender its note therefor. He brought suit against the town on the note to recover the money lent, specified in the note. The Supreme Court of New Jersey held, that municipal corporations in the absence of a specific grant of power do not in general possess the capacity to borrow money; and that a note given by such corporation for an unauthorized loan can not be enforced, even though the money borrowed has been expended for municipal purposes. Beasely, Chief Justice, delivering the opinion of the court said : "There can be no doubt with respect to the purposes, to which the money thus authorized to be levied is to be applied. It is the means whereby the duties of the local government are to be discharged. There is no limitation on the amount that may be raised, but *there is a* limitation on the method of raising it. It is not a general authority to raise money in any mode which the common council shall desire. The restriction is that it shall be raised by "a tax." How can it be claimed then, that it can be raised by a loan ? The power to borrow money is in a certain sense a larger power than that of raising money by taxation. There is an immediate check to excessive taxation, that is, the resistance of the parties taxed. There is none such in the power to borrow money, for the immediate burden of a loan is but slightly felt. It is plain that such a power would be full of peril to the owners of city property, and the widest door would be thus thrown open to extravagance, recklessness and fraud. My judgment is entirely averse to raising up this dangerous power by implication. If the rules of law compelled the court to make such implication, it seems to me such result would be largely injurious to the well-being of

the State; and it is therefore a satisfaction to know such rules of law do not exist."

But in the case under consideration it is contended, that the county of Lewis received and expended the money mentioned in the declaration, and that in this action upon the common counts for money had and received and for moneys paid, laid out and expended for the use of the defendant, and upon the account stated the defendant ought to be held liable upon its implied promise to repay the money. To permit a recovery of this money upon such implied promise would be virtually to make the unauthorized loan effectual in all cases, where the money borrowed had been used for the legitimate purposes of the county or municipality; and all the evils attendant on the power of borrowing money in an unrestricted form would supervene. The fallacy in the argument, that the law will raise an implied promise to repay the money, after it has been used, is, that the corporation is not competent to make the promise, which is sought to be implied. As an express promise to the effect contended for would be illegal, the law will not create one by implication. If the lender in such a case is remediless, he can not justly reproach the law for not providing him a remedy for his own folly and indiscretion.

The current of these decisions is unbroken save by the case of *Clark* v. *School District*, 3 R. I. 199, which would seem to recognize in the broadest possible manner the most liberal doctrine ever claimed by or allowed to private corporations, that they may exercise any implied power, which is not foreign to the purposes of their creation. In that case a school-district (a corporation under the school act) contracted debts to a considerable amount in building school-houses and for other school purposes, which debts, it was conceded, the district was in law liable to pay. The district instead of levying a tax to pay the same borrowed the money for that purpose and with it paid the debts and gave its promissory notes for the money so borrowed. The court rested its ruling upon 2 Kent. Com., sec. 298, that a corporation could not bind itself for purposes foreign to those, for which it was established, and thence reaches the conclusion, that as a borrowing of money under such circumstances was not foreign to the purposes, for which

the school-district was created, it had the right to borrow the money. We are unable to perceive, that the premises in any degree justify the conclusion. The power of borrowing money was not expressly granted to the school-district, and as it was clothed with ample power to raise the money by taxation to pay these debts, there was no necessity for resorting to any other mode of doing so, and there could be no reasonable ground to believe for a moment, that there was any necessity for doing so. The principle sought to be established by this case is, that the convenience of the corporation shall overrule the law creating it. This decision stands almost entirely alone and, as we conceive, in opposition to the authority in Kent, on which it pretends to rest; for that author in the same section, 298, lays down the rule as follows : "As corporations are the mere creatures of the law established for special purposes and derive all their powers from the acts creating them, it is perfectly just and proper that they should be obliged strictly to show their authority for the business they assume and be confined in their operations to the manner and mode and to the subject-matter prescribed."

But the counsel for the defendant in error argues, that the power to borrow money is conferred upon the county courts by the following provision of sec. 1 of ch. 50 of the Code of 1849: "The cost whereof" (court-house, clerk's office and jail) "and of the land, on which they may be, and of keeping the same in good order shall be chargeable to the county   *   *   * and may be levied for by such court," insisting that by the terms of this statute the county courts are vested with a discretion in the mode of providing the money necessary for this purpose, and that while the county court may levy for the same, it is not obliged to do so, and may in preference thereto resort to its implied authority to borrow the amount necessary for that purpose.

There are two answers to this argument, either of which is sufficient to refute it. *First,* By the very terms of the Codes of 1792, 1819 and 1849 the county courts are required to make annually an accurate account of every item of indebtedness against them, which is payable within the year, and to levy an amount sufficient to pay the same. *Second,* In a statute when the public interest is

concerned, and the public or third persons have a claim *de jure* that the power should be exercised, the word "may" means "must" or "shall." (*Newburg Turnpike Co.* v. *Miller*, 5 Johns. Ch'y R. 113; *Bean* v. *Simmons*, 9 Gratt. 389). From these considerations it is apparent the county court has no discretion on this subject and must levy to pay all the charges on the county, which may be payable within the year.

Are the notes in the case at bar the notes of Lewis county or the notes of James Bennett? Does the *addendum* of "Agent for Lewis county" make them the notes of Lewis county or merely describe the James Bennett, who made them? The best mode for an agent to sign a note for his principal, so that it may clearly appear he is the mere scribe of the principal, is as follows: "A. B. by his attorney or agent C. D," or "A. B. by C. D." (Daniels on Nego. Insts. § 303).

In *Baker* v. *Mechanics Fire Ins. Co.*, 3 Wend. 94, a promissory note, by which John Franklin as president of an insurance company promised to pay, &c., was held to be the note of John Franklin and not the note of the insurance company.

In *Taft* v. *Brewster*, 9 Johns. 332, a bond signed by the parties with their individual names as trustees, &c. of the Baptist church is the bond of the individuals not of the church.

In *Hills* v. *Bannister & Butler*, 8 Cow. 31, a negotiable note signed B & B., trustees of Union Religious Association, which was a corporation, was held to be the note of B. & B.

In *Bradlee, &c.* v. *Boston Glass Manufactory*, 16 Pick. 347, a note in these words: "For value received, we the subscribers jointly and severally promise to pay the (plaintiff) or order for the Boston Glass Manufactory $3,500.00 on demand with interest," signed by "H." "G." & "K." without annexing to their names any words designating a connection with the corporation, was held to be the note of the individuals and not the note of the corporation.

In *Sturdevant, &c.* v. *Hull*, 59 Me. 172 (8 Am. R. 409) a note in the following form: "I promise to pay to the order of S. & Co.," and signed by John T. Hull, Treasurer St. Pauls

Parish, is the note of Hull, and that parol evidence is inadmissible to show, that it was the understanding of the parties, when the note was given, that it was the note of the Parish and not of Hull.

In *Tannant* v. *The Rocky Mountain National Bank*, 1 Col. 279 (9 Am. R. 156) a bill of exchange for $1,500.00 signed "Thomas R. Tannant, agent for S. Taylor," and addressed to "S. Taylor, Providence, R. I.," was held to be the bill of Tannant and not of S. Taylor, and that parol evidence was not admissible to show an intent to bind S. Taylor.

In *Cragin* v. *Lovell*, 109 U. S. 194, it was held by the Supreme Court of the United States, that on a negotiable promissory note made by an agent in his own name, not disclosing on its face the name of the principal, no action lies against the principal.

In *De Witt* v. *Walton*, 9 N. Y. 571, a note in these words: "New York, June 20, 1850.—Four months after date I promise to pay to the order of W. H. B. Smith three hundred and twenty-four 59-100ths dollars, value received.— DAVID HUBBELL HOYT, agent for the Churchman," was held to be the note of Hoyt, and that the "Churchman" was not liable on the note; that such a note did not purport to be the note of the "Churchman," but of Hoyt, and that the words "agent for the Churchman" were mere words of description of the maker of the note.

The notes in this suit are made by James Bennett to the plaintiff; they do not on their face purport to be the notes of Lewis county, but they purport to be as they really are in contemplation of law the notes of James Bennett, and the *addendum* of "agent for Lewis county" can not change their legal effect or transform them into the notes of Lewis county.

Having already shown that the county courts of Virginia in 1855 had no power to borrow money for the erection of their court-houses, clerks' offices and jails; that they had ample powers to lay and collect annually such levies and taxes as were necessary to pay all sums chargeable upon the counties and payable within the year; that this authority to lay and collect these levies and the duty imposed upon them to appropriate and apply the same for that purpose excluded them from raising money for

county purposes in any other mode, we will now inquire, whether the unauthorized act of borrowing money can be subsequently ratified, so as to create a right of action against the counties for the moneys so obtained. Where an act of a corporation is forbidden by statute, neither the directors nor the stockholders thereof can waive the provisions of the statute. Every act done against a prohibitory statute is not only illegal but absolutely void, and the courts can not assist an illegal transaction in any respect or permit it to be set up as a protection. All contracts contrary to the provisions of a statute prohibiting the same are void ; and it is a general rule, that the courts will not aid either party in enforcing an illegal executory contract, nor, if executed, will they aid either party in setting it aside or in recovering back what has passed under it. Green's Brice's Ultra Vires 482, note a., 553 note a.; 20 Johns. 397.

In *Pennington* v. *Townsend*, 7 Wend. 276, it was held, that a foreign incorporated banking company being within the statute of New York forbidding all persons, associations and bodies corporate from carrying on banking-business unless thereunto specially authorized by law, if it violated this act, was not entitled to recover the amount of a check discounted by it ; that the check being founded on an unlawful act could not be enforced by action. The same principle is announced in *Thalimer* v. *Brinkirhoff*, 20 Johns. 397; *Goodall* v. *Jackson*, 20 Johns. 693; *Barton* v. *Port Jackson and Union Plank Road Co.*, 17. Barb. 404.

In the cases of *Kent* v. *Quick Silver Mining Co.*, and of *Hoy* v. *The same*, 78 N. Y. 159 it was held, that acts of a corporation not in themselves illegal nor prohibited by law, but which are *ultra vires*, affecting only the interest of stockholders may be ratified by the stockholders. Folger, judge, in delivering the opinion of the court, draws a clear distinction between the acts of a corporation, which are *ultra vires*, between itself and its individual stockholders which *may be ratified*, and those acts *ultra vires* which affect the public and are *incapable of ratification*. He says, in the application of the doctrine of *ultra vires* it is to be borne in mind, that it has two phases, one where the public is concerned, one between the corporate body and the stockholders in it, or between it

and its stockholders and third parties dealing with it and through it, with them. Where the public is concerned to restrain a corporation within the limits of the power given to it by its charter an assent of the stockholders to the use of unauthorized power by the corporate body will be of no avail. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or *malum prohibitum.* There no assent of the stockholders can avail them. A transaction entered into with the fatal infirmity of being in violation of law can not be purged of its infirmity by means of an estoppel; and no ratification can make good the act of a corporation or of an individual, which is prohibited by law; for the act being void in its inception is incapable of ratification (*Peterson* v. *The Mayor, &c.,* 17 N. Y. 454; *Martin* v. *Letterbach,* 38 Cal. 300; Green's Brice's Ultra Vires, 550).

In *Miners' Ditch Co.* v. *Leterbach,* 37 Cal. 543, discussing the doctrine of *ultra vires* the court said: "An act is said to be *ultra vires,* when it is not within the scope of the power of the corporation to perform it under any circumstances or for any purpose. An act is also sometimes said to be *ultra vires* with reference to the rights of certain parties, when the corporation is not authorized to perform it without their consent, or with reference to some specific purpose, when it is not authorized to perform it for that purpose, although fully within the scope of the general powers of the corporation with the consent of the parties interested or for some other purpose. When an act is *ultra vires* in the first sense mentioned, it is generally, if not always, void *in toto,* and the corporation may avail itself of the plea; but when it is *ultra vires* in the second sense, the right of the corporation to avail itself of the plea will depend upon the circumstances of the case."

Whenever the act in question is one, which the corporation is not authorized to perform under any circumstances, the defence of *ultra vires* is available to the corporation against all persons, because they are bound to know from the law of its existence, that it has no power to perform the act.

In *Wells* v. *Board of Supervisors of Pontotoc County,* 102 U. S. 625, it was held, that, where there was no authority in law for issuing municipal bonds, no recovery could be had in an action upon the bonds or the coupons.

In the case of *Lynde* v. *The County*, 16 Wall. 6, it was held, that the submission to the voters of a county under the code of Iowa of the question, whether the county judge at the time of levying the annual taxes shall lay a special tax of seven mills on the dollar of valuation for the construction of a court-house, the tax to be levied from year to year for the period of ten years, was by implication a submission of the question, whether money should be borrowed to build the court-house. This construction of the question submitted rested for its foundation upon the ground, that the statute authorized an appeal to the voters, only that they might give or refuse authority to incur a debt, for otherwise the vote conferred no authority, which the county did not already possess, and in that case it would have been an idle ceremony.

We are therefore of opinion, that, as the act of the county court of Lewis county in borrowing from the plaintiff the moneys in the declaration mentioned was not only unauthorized by law but was in effect prohibited by law, that the said notes as to the said defendant were void in their inception, and that the same were incapable of ratification, and that no action can be maintained against the defendant to recover the money specified therein; and that for the reasons hereinbefore stated the judgment of the circuit court of Lewis county rendered herein on January 8, 1886, in favor of the defendant in error must be reversed with costs to the plaintiff in error. And this court now proceeding to render such judgment, as the circuit court of Lewis county should have rendered, it is considered, that the plaintiff in said circuit court take nothing by his bill, but for his false clamor be in mercy, &c., and that the defendant recover of the plaintiff his costs in the circuit court expended.

SNYDER, JUDGE:

I concur fully in the points decided and conclusion announced in the foregoing opinion; but I do not concur in the position taken in the latter part of the opinion, which seems to assume, that because the act of the county court was un-

authorized, it was necessarily illegal. An illegal act or one against public policy will not under any circumstances be enforced against either a municipal or a private corporation; and likewise an act of a municipal corporation, which is *ultra vires* or unauthorized by its organic law, can not be enforced, yet the authorized act of a private corporation, if executed, may be enforced, and so may the unauthorized act of a municipal corporation, when the want of authority is not in its organic constitution but in the omission to observe the proper formalities. It therefore seems to me, that the discussion and authorities cited in the latter part of the opinion are irrelevant and inapplicable.

REVERSED.