# CHARLESTON.

## CITY OF CHARLESTON *v.* REED.

Submitted January 25, 1886.—Decided February 20, 1886.

1. A municipal corporation possesses and can exercise the following powers and no others: first, those granted by express words in its charter as the general statute under which it is incorporated; second, those necessarily or fairly implied in or incident to the powers thus expressly granted; and third, those essential to the declared purpose of the corporation, not simply convenient but indispensable. (p. 688.)

2. A city-charter conferring power upon a city-council "to make regulations for guarding against damage or damages from fires," authorizes the council to make an ordinance establishing fire-limits

and prohibiting the erection of wooden buildings within such limits. (p. 693.)

3. In a case brought to the Appellate Court to test the validity of an ordinance prohibiting within the fire-limits of a city the erection of houses, unless the same are built of " brick, iron, stone or concrete," which case shows, that the plaintiff in error has been fined for building a *wooden* building within said fire-limits, the Appellate Court will not consider, whether the ordinance was void, because it prohibited the erection of other buildings within the fire-limits than those specified in the ordinance. It is certainly good, so far as it prohibits within said limits the erection of wooden buildings. (p. 694.)

4. A building constructed of wood with its sides covered with sheet-iron three sixty-fourths of an inch thick inside and out, is not an "iron" building within the meaning of an ordinance which permits the erection of an "iron" building but prohibits the erection of a wooden one covered with sheet-iron. (p. 694.)

5. Punctuation must yield to the manifest intention of council expressed in an ordinance. (p. 696.)

6. The fact that other citizens of a city had built houses in violation of a city-ordinance, against whom no complaint had been made, or proceedings had, will not estop the city authorities from punishing the violation of the ordinance, whenever complaint is made. (p. 696.)

*Kenna & Chilton* for plaintiff in error.

*W. A. Quarrier* for defendant in error.

JOHNSON, PRESIDENT:

Mrs. Theresa Reed was having constructed in the city of Charleston in the interior of the square bounded by Kanawha street, Capitol street, Virginia street and Summers street, on her lot, which fronts on Virginia street, a building constructed in the following manner: It is two stories high, made of wooden studding, with a sheeting roof. All the sides of said building are to be covered with sheet iron. It is to be lined inside with sheet iron. The roof is to be covered with sheet iron. The bottom floor is dirt and to be filled up to cover the sills. The upper floor is to be constructed of wood overlaid and under laid with sheet iron. The entire building both inside and outside is to be covered with sheet iron, and the building is to have no windows. At the time

the facts were agreed, and from that agreement this statement is made, the building was so far constructed that the entire wooden frame was finished, and the wooden portion of the roof, the sheeting, was completed.   The building is eighty feet long thirty five feet wide, and twenty one feet high.   On the square,where it is being constructed, the Kanawha street front is entirely covered with buildings.   Capitol street front is entirely covered with buildings; Summers street front is almost covered with buildings, all of which are constructed in accordance with the fire-ordinance of the city. The rear of all these buildings in the square closely approach the Reed building, the nearest being that of J. C. Arnold, which is four feet six inches therefrom.   The rest of the buildings in said square vary from sixteen, to sixty feet distance therefrom.   All the buildings on the square are occupied by wholesale and retail merchants.   A plot of the square is filed with the agreement of facts and shows the position of each of said buildings relatively to the Reed building.

On Saturday the 22nd August, 1885, the defendant, Reed, was notified to stop the construction of the building, which she refused to do; and when the trial commenced, a large number of hands were at work on the building.   She claimed a permit from the city-council to construct the building. · Her petition to council was as follows :

"Your petitioner Mrs. Theresa. Reed respectfully prays, that she be allowed to build a warehouse on her lot on Virginia street in said city 80 feet long by 35˙feet wide in accordance with the fire-ordinance and the amendments thereto.

"THERESA REED.
"By Counsel."

The prayer of the petitioner was granted by a vote of four to three.   There was no other permit granted to her.   The ordinance of the city as to protection against fire, which was in the agreement of facts is as follows :

"Ordinance of October 31, 1879, amending and re-enacting an ordinance entitled:   'An ordinance defining the city-fire-limits.'

"Be it ordained by the common council of the city of Charleston .

"Section 1. That the ordinance entitled 'An ordinance defining the city fire limits' be and the same is hereby amended and re-enacted so as to read as follows: From and after the adoption of this ordinance, no new building or extension of old ones, shall be erected within the limits hereinafter described, except they be built of either brick, stone, iron or concrete, with fire-proof roof. The limits above referred to shall be known as the fire limits." * * Then follows the boundary including the Reed building.

"Section 2. In all cases where provisions of this ordinance are being violated, the mayor shall have the power to stop the work of building or extending until the matter can be brought before the common council.

"Section 3. Any person violating the provisions of this ordinance, shall, upon conviction thereof be fined in a sum not exceeding one hundred dollars.

"Section 4. (Repeals all ordinances in conflict with this.)"

The ordinance of August 3, 1883, is entitled, "An ordinance defining more strictly the fire-ordinance" and is as follows:

"Be it ordained by the common council of the city of Charleston, that the fire ordinance shall be so construed and understood as to prohibit, the erection within the fire-limits of the city of any wooden houses covered with tin or iron."

The last ordinance is dated October 26, 1883, and is as follows: "An ordinance prescribing the conditions upon which outbuildings, other than coal houses and privies, may be erected within the city fire-limits:

"Be it ordained by the common council of the city of Charleston, that hereafter it shall be lawful to erect within the city fire-limits, after first obtaining a permit therefor, outbuildings other than coal houses and privies not exceeding 10x15 feet in outer dimensions, provided the same be covered by tin or sheet iron nailed on studding, and provided further that the same be built not closer to the adjacent street or premises than ten feet, unless in the latter case the owners of said adjacent premises consent that the distance herein prescribed may be less."

The agreement of facts embraced also the following, that there was given in evidence a plat and certificate made by

the city-engineer in regard to the character, material and structure securing buildings in fire-limits of said city.  *  * Also there was read in evidence the permits of the city mayor and council, under which the buildings mentioned in said plat and certificate were constructed, which permits were as follows:  *  *  *  No permits except that to the defendant, Theressa Reed, accompany the certificate of the facts agreed.  There appears a paper from the city-engineer, which is by agreement of the parties made a part of the records in which he shows the manner of the construction of a number of houses within the fire-limits of the city of Charleston, by which it appears, that in the Reed warehouse the underside of the second floor and the underside of the roof will be covered with sheet iron of the same weight and thickness as the sides, inside and out, and the roof; thickness of iron about three sixty-fourths of an inch, No. 27 stove pipe iron, same as employed in other warehouses.

That the Skees building corner of Capitol and Virginia streets is a brick building with mansard roof.  The framework of the roof and the interior of the building are of wood; the partitions of frame; studding 244 standing upright covered with plastering.  Roof covered with tin.  There is an elevator in the rear of this building beginning at the level of the street, and extending to the top of the roof three stories.  This elevator is a framework of wood covered with ordinary sheet iron.  Elevator was built in 1881.  All the window frames are of wood, the latter being exposed to view from the outside.

O. H. Michaelson's warehouse on Virginia street is in the rear of M. H. May's residence sixty-two feet from it and eight feet from Mr. Wiseman's stable and twenty-eight feet from his house.  The building is now under construction; when completed it will be 60x36 feet, two stories high and have a one story shed attached 36x14 feet.  The building will be covered on top with sheet iron of the ordinary weight, and on the sides with corrugated iron.  Will be occupied as a warehouse for machinery.  The framework of the building is of wood built in the ordinary way.  On this the sheet iron will be nailed.

Ruffner Bros'. warehouse on Virginia street is a frame

structure covered with sheet-iron. The wood-work of the interior is all exposed to view. The iron covering the top and sides is of the thickness of ordinary stove-pipe. It stands ninety-five feet from Ruffner Bros'. store, 47½ feet from Mrs. Scott's dwelling, ninety-five feet from another residence, and ninety six feet from the Skees building; was erected in 1884; is 30½x30, six feet high at the eaves.

Gates & Co's. is 30x25 feet and eight feet high at eaves; is wood covered with sheet iron; built in 1885.

Young's stable on Virginia street was built in 1883, built of wood covered with corrugated iron. It is 100x30 feet with a shed 50x16 feet.

The store of Rust on Capitol street is built of brick and covered with tin. All the interior walls are of wood and plastered. The cornices over the store-fronts are wood; the main cornices are of galvanized iron, the base of which is wood. All the window frames are of wood exposed to view from outside; built in 1881.

The Arnold building, Front street, is of brick, tin-roof laid on sheeting of inch-boards. Rear cornice of wood covered with sheet-iron. Rear window-shutters of wood uncovered; and window-frames of wood exposed to view from outside.

The McCorkle building on Summers street is constructed in much the same way as the Arnold building. The buildings on either side are built in the same way. All three of these buildings have rear balcony porches to second story built of wood. All these buildings were erected in 1883.

It also appears that the frame-work of the Reed building is about the usual size; and that in proportion to the size of the building no more lumber is used than in the erection of buildings of this class.

A number of interested parties on August 14, 1885, made complaint before the recorder of the city of Charleston, that Theressa Reed was then erecting a building in the interior of the square, bounded by Kanawha, Capitol, Virginia and Summers streets, within the fire-limits of the city of Charleston, of a size, in a manner and of material prohibited by the ordinance of said city, and prayed that she might be apprehended and held to answer the complaint and dealt with

in relation thereto, as the ordinances of said city may require. The complaint is signed by four citizens and sworn to by one of them. On the same day the recorder issued a summons to Theressa Reed to appear before him and answer said complaint. On August 26, 1885, the complaint was heard; and the evidence being heard, the recorder imposed a fine on the defendant of $75.00, and ordered the city sergeant and the policemen of the city "to stop the work of building the house described in said complaint, until the matter can be brought before the council." Theressa Reed then moved the recorder to set aside his judgment and grant her a new trial, which motion was overruled.

On October 12, 1885, Theressa Reed presented her petition to the circuit court of Kanawha county, praying said court to issue a *certiorari* to bring up the record and proceedings in said case before the said recorder of the city of Charleston, which writ was awarded; and thereupon the city of Charleston by its attorney appeared at once to said writ waiving service and by consent said matter was submitted for trial; and the court having seen and inspected the record, and having heard the argument of counsel decided, that said judgments of the recorder were plainly right, and dismissed the said writ with costs.

To this judgment Theressa Reed obtained a writ of error and *supersedeas.*

It is argued by counsel for plaintiff in error, that the several fire-ordinances of Charleston are void, because there was no authority in the charter of the city to pass any such ordinances; that the real test of all ordinances passed by an incorporated body is the intention of the Legislature in granting the charter; that corporations can not make ordinances contrary to their charters. If there is no authority in the charter of the city of Charleston to pass the said ordinances, of course according to the great weight of authority they are void. (*Ruggles* v. *Collier*, 43 Mo. 353; *Cook County* v. *McCris*, 93 Ill. 236; *Somerville* v. *Dickerman*, 127 Mass. 272; *Bryan* v. *Page*, 51 Tex. 532; *Allen* v. *Galveston*, 51 Tex. 302; *Dore* v. *Milwaukee*, 42 Wis. 108; *Butler* v. *Nevin*, 88 Ill. 575; *Vance* v. *Little Rock*, 30 Ark. 435; *New London* v. *Brainard*, 22 Conn. 552; *Christie* v. *Malden*, 23 W. Va. 667.

Our Court in the last named case has correctly settled the powers of municipal corporations in this State, as follows:

"A municipal corporation possesses and can exercise the. following powers and no others: 1st, those granted in express words by its charter, or the general statutes under which it is incorporated; 2nd, those necessarily or fairly implied in or incident to the powers thus expressly granted; and 3d, those essential to the declared purposes of the corporation, not simply convenient, but indispensable."

In 1 Dillon Mun. Corp. 400, sec. 405, it is said, that municipal corporations, generally, with power to provide for the safety of their inhabitants, may prohibit the throwing of heavy or dangerous articles from the upper stories of the buildings into the streets or open spaces near them, when persons are in the habit of passing, and may, where this is consistent with the general and special legislation applicable to the municipality, establish fire-limits and prevent the erection therein of wooden buildings.  For this proposition are cited *City Council* v. *Elford*, 1 McMullen Law 234; *Brady* v. *Ins. Co.*, 11 Mich. 425; *Douglass* v. *Commonwealth*, 2 Rawle 262; *Wadleigh* v. *Gilman*, 12 Me. 403; *Vanderbilt* v. *Adams*, 7 Cow. 349-352, per Woodruff, J.

In *City Council* v. *Elford* nothing more is decided than a construction of a city ordinance, the court holding that to throw bales of cotton from the upper story of a cotton warehouse is a violation of the ordinance.

In *Bradley* v. *Insurance Company* it was held, that the common council of Detroit had power to pass ordinances establishing fire-limits and forbidding the re-building or repair of wooden buildings within such limits.  The majority of the court by Martin, Chief Justice, said: " Of the power of the common council to pass the ordinances in question we have no doubt. They controvene no provision of the constitution as we read it, and they were made in the exercise of a police-power necessary to the safety of the city.  A regulation of the use of property, or a prohibition of its repair when partially destroyed, can not to my mind be regarded as a condemnation to public use."  The charter allowed the city to prevent the " *location or construction* " of wooden buildings, the " *removing* " of such buildings, and the " re-building or repairing " of the same within the fire-limits, which may be adopted.

In *Douglass* v. *Commonwealth* it was held, that to elevate and enlarge a wooden building, so as materially to alter its character is an offence within the meaning of the ordinance " to prevent the erection of wooden buildings within certain limits of the city of Philadelphia." It is not stated what the provision of the charter was, under which the ordinance was passed. It is presumed that the charter authorized the ordinance.

In *Wadleigh* v. *Gilman* it appeared, that the act incorporating the city of *Bangor* conferred authority on the city, "to ordain and establish such acts, laws and regulations, not inconsistent with the constitution and laws of the State, as shall be needful to the good order of such body politic." It was held that an ordinance of the city-government prohibiting the erection of wooden buildings in the city within certain limits was within the authority conferred. Weston, C. J., in delivering the opinion of the court, said : " The regulation in question is for the general benefit. It adds to the value of the property by lessening the hazard from fire, which operates as a tax upon it, whether the owner is his own insurer or procures others to take the risk for a valuable consideration. And economy as well as safety is really consulted, by building with durable materials. Nor is there any danger that the power to pass ordinances of this character, will be wantonly or unnecessarily exercised. The city authorities are annually elected by the citizens from among themselves. No law of theirs, not acceptable to the majority would be tolerated or suffered to remain."

The charter of New Haven authorized the city to make ordinances " to protect said city from fire ; to organize, maintain and regulate a fire-department and fire-apparatus; to regulate the mode of building and the materials used for building, or altering buildings within the city or any part thereof, and the mode of using any buildings therein, and of heating the same, when such regulations seem expedient for the purpose of protecting said city from the dangers of fire," &c. It was held that an ordinance passed under said charter " establishing a fire district and forbidding the erection or placing of any wooden building within the district without license given by the board of aldermen declaring such build-

ing should be deemed a common nuisance and making it the duty of certain officers after reasonable notice to abate it," was fully authorized by the charter and was reasonable." (*Hine* v. *City of New Haven*, 40 Conn. 478.)

The original charter of the city of Keokuk provided: " The city council shall have power and it is hereby made their duty to make and publish from time to time all such ordinances, as shall be necessary to secure said city and the inhabitants thereof against injuries by fire, thieves, robbers, burglars and all other persons violating the public peace." Section 21 of the amended charter provided : " The city council for the purpose of guarding against the calamities of fire, shall have power to prescribe the limits within ,which wooden buildings shall not be erected, or placed, or repaired, without the permission of the said council, and to direct that all, or any building within the limit prescribed, shall be made or constructed of fire-proof materials," &c.   It was held that the general power conferred by the original charter was limited by the amendment, and that the city had no authority to pass an ordinance for protection against fires not authorized thereby. (*City of Keokuk* v. *Scroggs*, 39 Ia. 447.)

The charter of the town of Greenville, Mississippi, gave the council power " to provide for the prevention and extinguishment of fires, and to organize and establish fire companies," &c.; and it was held, that, while the charter did not in express terms give the council power to establish " firelimits," and prohibit the erection of wooden buildings therein, yet such power is by the charter by fair implication conferred on the council. (*Alexander* v. *Town Council*, 54 Miss. 659.)

In *Monroe* v. *Hoffman*, 29 La. An. 651 it was held, that the power to forbid the erection and compel the removal of buildings formed of combustible materials, within the densely-built parts of a town, inheres in municipal corporations, and hence does not depend upon any legislative grant.

Now opposed to this construction of the charter of cities, as to the power to prevent the erection of wooden buildings, two cases are cited and relied on by counsel for plaintiff in error : *Mayor of Hudson* v. *Thorne*, 7 Paige and *Pye* v. *Peterson*, 45 Tex. 312.

In *Hudson* v. *Thorne* it appeared, that the charter of the
city authorized the council from time to time to pass such or-
dinances as they should think proper to remove or prevent
the construction of any fire-place, hearth, chimney, stove,
oven, boiler, kettle, or apparatus used in any house, building,
manufactory, or business; which might be dangerous, in
causing or promoting fires; to regulate or prevent the carry-
ing on of manufactories dangerous in causing or promoting
fires; to adopt and establish such regulations for the
prevention or suppression of fires as might be neces-
sary, &c. The ordinance declared: "No person shall
erect or construct or cause to be erected and constructed,
any wooden or frame barn, stable, or hog-pens, within the
certain specified limits of the city of Hudson of more than
thirty feet in width and thirty feet in depth, without the per-
mission of the common council, &c." The Chancellor said:
"I am satisfied, that under the provisions of this charter the
Legislature never intended to give to the common council
the power to restrict the erection of wooden or frame build-
ings within the city, or to limit the size of buildings which
individuals should be permitted to erect on their own prem-
ises."

In *Pye* v. *Peterson*, 45 Tex. the charter of Navasota author-
ized the council to "ordain and establish such acts, laws,
regulations, and ordinances not inconsistent with the consti-
tution or laws of this State, as shall be needful for the gov-
ernment, interests, welfare and good order of said body poli-
tic." The ordinance of the city "established 'fire-limits'
declaring wooden buildings thereafter erected within these
limits to be nuisances, and providing for the removal of such
buildings and the punishment of the parties erecting them."
The cause was an injunction against the enforcement of the
ordinance, and the inferior court perpetuated the injunction
which decree on appeal was affirmed. Gould, Judge, for the
whole court said:

"The erection and occupation of such buildings is an or-
dinary exercise of the property rights of the owner of the
lands, and is far from falling within the legal definition of a
nuisance at common law. The power to prohibit such build-
ings in certain localities is statutory, and is a limitation on

the ordinary rights of property. Whilst the legislative power to authorize such prohibitions is now conceded the nature of the power is so high and the subjects themselves, so far various that it seems not naturally embraced in the subordinate power to declare and abate nuisances. To so construe it would be to extend the grant of power to a subject not we think within the intention of the law-makers in the clause cited. * * The general disposition of the courts of this country has been to confine municipalities within the limits that a strict construction of the grants of power in their charters will assign to them; thus applying substantially the same rule that is applied to charters of private corporations. The reasonable presumption is that the State has granted in clear and unmistakable terms all it has designed to grant. (Cooley Con. Lim. 195.) This presumption applies with undiminished force, where the power sought to be implied is one to limit those rights of property which are secured to every citizen under the general laws of the State. (Potters' Dwarris p. 146.) To infer the power to establish fire-limits, from the general terms used in this charter, would be to disregard the rules of construction just cited, and would go far in the direction of the opposite proposition, that specific grants of power are unnecessary. If this general clause includes the power claimed, it would seem difficult to place limits on its meaning."

Here we have the two extreme views, one in the Louisiana case, where it is held that the power to establish fire-limits and prohibit the erection of wooden buildings therein inheres in every municipal corporation independent of the specific powers granted in the charter, and the other in the Maine case, where it was held that the power was fairly implied from the language of the charter authorizing the council " to ordain and establish such acts, laws and regulations not inconsistent with the constitution and laws of this State, as shall be needful to the good order of said body politic." In *Pie* v. *Peterson* no express authority was given in the charter, nor was there authority by implication to prevent the erection of wooden buildings.

Now what are the powers conferred by the charter of the city of Charleston upon its council? The charter of

the city was amended and re-enacted by the Legislature of 1875. Acts 1875, p. 517. The following among other powers by said charter are conferred upon the city council :

" To control the construction and repairs of all houses."

" To provide for the regular building of houses or other structures, and determine the distance they shall be built from any street or alley."

" To prevent injury or annoyance to the public or individuals from anything dangerous."

" To make regulations for guarding against danger or damages from fires."

" To promote the general welfare of the city and to protect the persons and property of the citizens therein."

No authority has been cited, that would deny to the council the power, exercised in this instance; under a charter, which authorized it " to adopt and establish such regulations for the prevention or suppression of fires as might be necessary," or under a charter conferring as large power for the " prevention of fires," as the charter of the city of Charleston, unless it be *Hudson* v. *Thorne*, 7 Paige 261. But here larger powers are granted than to the city of Hudson. In addition to the clause, "to make regulations for guarding against danger or damages from fire," we have the power " to control the construction and repairs of all houses." Now it seems to me, that the provisions of the charter of Charleston is the equivalent of conferring upon the council the power, " to from time to time establish 'fire-limits' and prevent the erection of wooden buildings therein." These powers it seems to me, if not expressly granted, are fairly implied from the language used in the charter, and are incident to the powers expressly granted, and are moreover essential to the declared purposes of the corporation, not simply convenient but indispensable. It is true that the ordinances of a city government must be reasonable. (*Moundsville* v. *Fountain*, *supra*, 182 and *Jelly* v. *Dils*, *supra*, 267.) But the ordinances here so far as they prevent the erection of wooden buildings within the "fire-limits" are reasonable. They are essential to the safety of property within the city. No man would want to invest his money in a populous part of the city, with the danger always present, that his neighbor owning a lot by his side or in the rear of his lot may at will erect thereon a

barn and fill it with a combustible material or build it of material that is highly combustible, and which may at any time burn down and subject him to great loss. His insurance under such circumstances would of course be much higher; and if it was declared that the city had no power to protect his property by prohibiting such erections, a death-blow would be struck at the prosperity, and capital would not only refuse to come to the aid of the prosperity of the city, but that already employed would be sacrificed, and its former owner would leave for a place where under the law it could be protected. The ordinances are within the power conferred by the charter, at least so far as they prohibit the erection of wooden buildings within the " fire-limits " of the city.

It is insisted, that they are void because they prohibit the erection of any buildings except four kinds, to-wit: brick, iron, stone and concrete. Express authority is given by the charter to the council: " To control the construction and repairs of all houses." Whether the council under the charter, has the right to prevent the erection of a zinc, marble, steel, tin, copper and brass buildings as argued, we will not here decide, as no such case is here presented. The question here is, whether it can establish fire-limits and prevent the erection of wooden buildings therein. The council has designated in its ordinances the kind of buildings usually put up in populous parts of cities, viz: brick, iron, stone and concrete. Marble is stone as I understand it, and people do not often, I believe, erect buildings of slate, tin, copper, brass and zinc.

But it is argued, that Mrs. Reed's building is an " iron " building within the meaning of the ordinances. This building is in no sense an iron one. A wooden building covered with sheet iron three sixtyfourths of an inch thick is no more an iron building, than it would have been a paper or tin building if it had been covered inside and out with thin sheetings of paper or tin. This is the natural construction to be put on the ordinance of October, 1879. But the council by its ordinance of April 3, 1883, declares that " the fire ordinance shall be so construed and understood as to prohibit the erection within the fire-limits of the city of any wooden houses covered with tin or iron." It is argued by counsel for plaintiff in error, the word " covered " as here

used refers to the "roofing." This is an impossible construction. The ordinance of 1879, required all buildings within the fire-limits to be covered with "fire proof roof." Now if the construction insisted on is given to the ordinance of August 3, 1883, it would destroy the effect of the ordinance of 1879 requiring buildings to be built of brick, &c., and would permit the erection of wooden buildings so they were *not roofed* with tin or iron. It means that a building shall not be constructed of *wood* even though the walls are covered with tin or iron. The council did not consider such buildings anything but wooden buildings, which were prohibited by the ordinance of 1879.

By the ordinance of October 26, 1883, parties obtaining a permit therefor might erect buildings of wood other than coal houses and privies, provided such houses should not in dimensions exceed 10x15 feet, and be covered with tin or sheet iron nailed on the studding, and provided further that the same may be built within ten feet of the adjacent street or premises, unless in the latter case the owners of the adjacent premises consent that the distance might be less.

It is insisted in argument, that the last ordinance means, that council might permit the erection, of any wooden building of any dimensions, (other than coal-houses or privies not exceeding 10x15 feet in outer dimensions,) provided they were covered by tin or sheet-iron nailed on the studding; and Mrs. Reed having a permit to build such a structure is protected by this ordinance. By this construction, the ordinance of October 26, 1883, would repeal both the other ordinances. The way the sentence is punctuated in the copy of the record, gives the only color to this construction. It is there printed as follows: "That hereafter it shall be lawful to erect within the city fire-limits, after first obtaining a permit therefor, outbuildings, other than coal houses and privies not exceeding 10x15 feet in outer dimensions, provided," &c. "Other than coal houses and privies," by the sense of the ordinance, should have been in parenthesis, or have been separated from the rest of the sentence by commas. It would be absurd to say that the council intended by this ordinance to repeal the other two. We must read all three of the ordinances, which are upon the same subject,

together.   Punctuation must yield to the manifest intention expressed in the ordinance.

It is also contended, that the judgment should be reversed because the prosecution is premature; that the building is not yet completed, and the ordinance provides for only one conviction for its violation.   Would the plaintiff in error desire, that council should wait until the building was completed and she had spent all the money, she had intended to spend on it, and then be not only fined but perhaps required to take the building down ?  Or would public policy require, that no complaint should be entertained until the building was completed, and the hazzard to the surrounding buildings greatly increased?   When the prosecution was commenced, "the ordinance was being violated," the building was being erected. The second section of the ordinance provides, that where the provisions of the ordinance "are *being* violated" the mayor shall have the power  to stop the *work* of *building*, &c., until the matter  could be  brought  before the common council. The third  section  provides that "any person violating the provisions of this ordinance, shall on conviction thereof be fined in a sum not exceeding $100.00.   She was fined for violating said ordinance "$75.00," and as a part of the judgment the recorder, as he had a perfect right to do, ordered the policemen to stop the  building of said  house until the matter could be brought before the council.

It is also argued, that other buildings like Mrs. Reed's had been built since the adoption of the ordinance of 1879.  The agreement of facts shows, that this is true.   But the permits are not in the record.   It is presumed that the permits were like that granted Mrs. Reed, to build " in accordance with the fire-ordinances," and were violated without complaint to council, as Mrs. Reed violated the permit given to her.    The authorities were prompt to deal  with Mrs. Reed as soon as complaint was made.   The fact that the ordinances had been violated without punishment, is no  reason why they should continue to be so violated.

It is assigned as error, that the warrant charged no offence. We have found to the contrary.

It is also assigned as error, that the complaint is not properly sworn to.   There is nothing in this.   The defendant ap-

peared, and waived the objection, if one existed.    The proceedings all seem to have been regular, and the conviction proper.    There is no error in the judgment of the circuit court and it is therefore affirmed.

AFFIRMED.