## THE CITY OF TOPEKA v. JOEL HUNTOON.

1. SEWER DISTRICT — *Fraud* — *Judicial Interference.* In the absence of positive proof of fraud, the establishment of a sewer district in a city of the first class by the mayor and council thereof is not subject to judicial interference.

2. COUNCILMAN — *Voting* — *Disqualification.* To disqualify a member of a city council from voting on the passage of an ordinance establishing a sewer district, it must appear that he has a pecuniary interest in the measure adverse to that of the city.

*Error from Shawnee District Court.*

THE material facts are fully stated in the opinion.

*S. B. Isenhart,* for plaintiff in error.

*Wheat & Curtis,* and *Douthitt, Jones & Mason,* for defendant in error.

Opinion by SIMPSON, C.: In the month of August, in the year 1889, a large number of real-property owners in the city of Topeka presented to and filed with the clerk of said city a petition requesting the mayor and council to create a certain sewer district, and to build and construct sewers therein. This petition was presented to the council; referred to its committee on ways and means; was considered by the committee; and the city engineer was requested to suggest the proper territory that should constitute the sewer district. The committee and the city engineer reported after some months, and finally, on the 27th day of January, 1890, the mayor and council passed an ordinance creating and establishing sewer district No. 14, defining the territory thereof, providing for a complete sewer system therein, and providing for the manner of construction and the payment thereof. Said ordinance was duly approved and published.

On the 27th of February, 1890, three disinterested householders of the city were appointed to value and appraise the real property situate in said sewer district, preparatory to a levy of the assessments thereon to pay for the work. On March 27, 1890, detailed estimates were duly prepared and filed by the city engineer, and the city clerk was authorized to advertise for sealed proposals for the building of the sewers. Sealed proposals were received, and the city authorities were about to enter into a contract for the construction of the sewers, when an injunction was granted by the district court of the county. The petition for injunction set forth, among other things, that the person applying therefor, Joel Huntoon, was the owner of real property, all of which was included within

said sewer district, and would be subject to taxation for the payment of the costs of constructing said sewers; that various other tracts or lots needed sewers, and ought to have been included in said sewer district in order to relieve the property of the plaintiff and make his burden lighter; that one Hale Ritchie was a member of the city council, and owned a number of tracts and pieces of land which were not taken into said sewer district; that one E. B. Whaley was a member of the city council, and that his wife owned six or eight lots which were not included in said sewer district; that said Whaley appeared before the ways and means committee and before said city council, and illegally and fraudulently used his personal and official influence with intent and for the purpose of inducing the city council to pass the ordinance, leaving out of the boundary of said sewer district certain real estate belonging to Hale Ritchie, and to the wife of the said Whaley, and that said property was left out and needed sewers. In due time an answer was filed and the cause tried, the court making special findings and separate conclusions of law, as follows:

"CONCLUSIONS OF FACT.

"1. Several months prior to January 27, 1890, the mayor and councilmen of the city of Topeka, defendant, by resolution directed the city engineer to make surveys with the view of creating a sewer district in territory situated in the third and fifth wards of the city of Topeka, with a main sewer commencing and connecting with a large main sewer before that time constructed from at or near the intersection of Tenth avenue and Adams street in the city of Topeka, extending the said main sewer from said connection at Tenth avenue and Adams street in the city of Topeka; thence westerly through the fifth and third wards of the city of Topeka toward or west of Lane street in the city of Topeka. In obedience to the said direction of the mayor and councilmen of the city of Topeka, the city engineer of the city of Topeka made the necessary topographical surveys for the purpose of locating said main sewer and the necessary lateral sewers for said new sewer district, and a description of the boundaries of said new sewer district, for the use of the mayor and councilmen of the city of Topeka, for the purpose of enabling the mayor and coun-

cilmen of the city of Topeka to enact the necessary ordinance for the establishment and creation of said new sewer district; and the said city engineer reported and recommended to the mayor and councilmen of the city of Topeka that the said new sewer district should be defined and bounded by ordinance substantially as bounded, defined and described by the map or profile attached to plaintiff's petition and marked 'Exhibit B,' and made a part of said petition, including the green, yellow and blue coloring on said map or profile.

"2. Long before the passage, approval and publication of ordinance No. 1093, to wit, January 27, 1890, hereinafter mentioned, and the passage of the resolution directing the city engineer to make a topographical survey for the proposed sewer district, all that portion or part of the city of Topeka which lies between Adams street and Van Buren street, and north of Tenth avenue in said city, sewers for public use had been built, constructed, and were maintained by said city in various sewer districts, under and in accordance with several and different ordinances of said city, and the lots and blocks in said sewer districts had been before that time assessed and taxed by the mayor and councilmen of the city of Topeka to pay for the building and construction of said several main and lateral sewers in said several districts, and one of such main sewers, in district No. 12, so built and constructed and maintained by said city, commenced at or near the point or place described as the commencing point for the main sewer mentioned and described in ordinance No. 1093, creating sewer district No. 14, and thence running northerly to and discharged or emptied into the Kansas river, in the city of Topeka.

"3. For a long time prior to and at the passage, approval and publication of ordinance No. 1093, and from thence until the present time, Martha Whaley, the wife of one E. B. Whaley, was and is the owner of the following-described real estate, to wit: Commencing at the southwest corner of lot No. 350, on Monroe street, in the city of Topeka; running thence easterly 150 feet; thence northerly at right angles with the last-mentioned line to the north line of the northeast quarter of section 6, township 12, range 16; thence west, along said section line, to the east side of Monroe street; thence southerly along the east side of Monroe street to the place of beginning, and the same being a part of said quarter-section. Also, the following-described real estate: Commencing at a

point 225 feet north of the northwest corner of Madison and Eleventh streets in the city of Topeka, on the west side of Madison street, and running thence westerly on a line parallel with Eleventh street 150 feet; thence northerly to the north line of the northeast quarter of section 6, township 12, range 16; thence east to the north line of said quarter-section to the west line of Madison street; thence southerly along the west line of Madison street to the place of beginning, the same being a part of said quarter-section. Both of said described pieces or parcels of land were where the city engineer made his topographical survey for the mayor and councilmen of the city of Topeka, and within the boundaries of the premises described in conclusion of fact No. 1, and is a part of the premises included within the blue coloring on the map marked 'Exhibit B,' and made a part of plaintiff's petition; and at all times heretofore and hereafter mentioned in these conclusions of fact, the said Martha Whaley and her husband, E. B. Whaley, occupied these premises as their homestead.

"4. For a long time prior to the passage of said ordinance No. 1093 by the mayor and councilmen of the city of Topeka, and from thence to this time, one Hale Ritchie was and is the owner of the following-described real estate in the city of Topeka, to wit: Lots Nos. 445, 447, 449, 457, 459, 461, 436, 438, 440, 448, on Quincy street, and lots Nos. 434, 436, 446, 448, 450, 460, 462, 464, on Kansas Avenue, and lots Nos. 380, 382, 384, 392, 394, 396, 434, 436, 438, 446, 448, 450, 452, 454, 456, on Monroe street, lots Nos. 377, 379, 381, 383, on Madison street, and all of that block of ground lying east of Madison street, south of Eleventh street, west of Jefferson street and the right-of-way of the Kansas, Nebraska & Dakota Railway Company, and north of Twelfth street, excepting the alleys in said block; and the said Hale Ritchie, prior to the passage of said ordinance, resided on said premises with his family, and has ever since continued to reside on said premises, and all of said premises last above described are within the boundaries of the proposed sewer district surveyed by the said city engineer, or said district described in conclusion of fact No. 1, and within the boundaries of the map attached to plaintiff's petition, and within the territory on said map indicated and marked in blue color.

"5. For a long time prior to and at the passage of said ordinance No. 1093 by the mayor and councilmen of the city of Topeka, one John Ritchie, the brother of said Hale Ritchie,

was the owner of about 31 lots situated on Kansas avenue, Quincy street, Monroe street, Madison street, in the city of Topeka, and these lots are within the boundaries of the map attached to plaintiff's petition, and within those parts or portions of said map colored in blue, and between Thirteenth street and Fourteenth street, and Jackson street and the K. N. & D. Railway. There were, at the time of the passage of said ordinance No. 1093, and are on said lots mentioned, to wit, lots 433 and 435, on Kansas avenue, and which are the first lots south of Thirteenth street, and very close to the proposed main sewer of said district No. 14, two large brick business buildings with cellars or basements underneath the same, which were owned by said John Ritchie, and of the value of $12,000, and which two last-mentioned lots and buildings would be greatly benefited by the said main sewer, if built as proposed.

"6. For a long time prior to and at the passage of said ordinance No. 1093, and thence hitherto, one John Elliott was and still is one of the councilmen of the city of Topeka; and the said John Elliott was present at the meeting of the city council of said city at the passage of said ordinance No. 1093 by the mayor and councilmen of said city, he, the said Elliott, being one of the members of the city council who voted for said ordinance, and during all the time aforesaid the said Elliott was and still is the owner of two lots on Monroe street, in the city of Topeka, fronting east, and between Tenth avenue and Eleventh street, and in the territory colored blue on the map of said proposed district No. 14, as surveyed and proposed by the city engineer, and as defined in conclusion of fact No. 1.

"7. For more than one year before and at the time of the passage of said ordinance No. 1093, to wit, January 27, 1890, by the mayor and councilmen of the city of Topeka, the said E. B. Whaley, the husband of the said Martha Whaley, Hale Ritchie, brother of the said John Ritchie, and John Elliott, were members of the city council of the city of Topeka, duly qualified and acting as such. Before the passage of said ordinance No. 1093, defining the boundaries of sewer district No. 14, a controversy arose in the city council among the councilmen of the city of Topeka concerning the boundaries of said new sewer district. Some of the said councilmen contended that all of the territory surveyed and defined by the city engineer, in obedience to the instructions and resolutions

adopted by the mayor and councilmen of the city of Topeka preliminary and preparatory to the creation by ordinance of the said sewer district No. 14, should and ought to be included within said district, and some of the councilmen contended that unless the map or plan prepared and made by the city engineer for the use of the mayor and councilmen preliminary to the passage of an ordinance creating and defining the territory of said sewer district was changed or modified, so as to exclude all of the said territory marked in blue color, as indicated on the map attached to the plaintiff's petition, from the boundaries of the said proposed district, they would use their influence to defeat its passage by the mayor and councilmen, and would defeat any ordinance or any other provision for sewers within this district. Said land or territory marked in blue color on said map is largely owned by said Hale Ritchie and John Ritchie, his brother, and the property heretofore described, belonging to Martha Whaley, wife of E. B. Whaley, and the said John Elliott, is a part of the property marked in blue color on said map. One Benj. M. Curtis was at the time of the passage of said ordinance, and for more than a year before that time had been, a member of the city council of the city of Topeka, from the third ward of said city, and was very desirous of adopting the topographical survey and recommendations of the city engineer of said city, and this included all the territory included in said map marked yellow, blue, and green, as shown on said map, and was desirous that the mayor and councilmen should pass the appropriate and necessary ordinance creating said sewer district, including within its territory all the land and lots surveyed by the city engineer in obedience to the direction of the mayor and councilmen; but the said Curtis and other councilmen, fearing that the owners of the land and lots indicated in blue color on said map would defeat said ordinance unless the territory marked in blue color was omitted from said ordinance, consented and agreed with the members of the city council who owned property in the territory marked in blue color on said map, that such territory marked in blue color on said map, including the property of the Ritchies, Whaley, and Elliott, should be excluded from said sewer district No. 14, for the purpose and with the design that all of the real estate included and marked on said map in blue color, including the property heretofore described in these conclusions of fact belonging to Martha Whaley,

Hale Ritchie, John Ritchie, and John Elliott, should not be required to pay its proportion of the necessary assessments and burdens to be imposed upon the lots, blocks or parcels of real estate interested in or benefited by said main sewer in said district No. 14, and for the purpose of compelling the real property indicated on said map in yellow color to pay all the assessments and burdens necessary for the purpose of constructing the main sewer from the junction of Tenth avenue and Adams street, in the city of Topeka, thence west to Lane street, as shown on said map. Thereupon, in pursuance of such agreement and understanding, to wit, January 27, 1890, at a meeting of the mayor and councilmen regularly had and held, ordinance No. 1093, entitled, 'An ordinance creating sewer district No. 14, defining the territory and establishing the boundary thereof, and providing for an entire and complete system of sewerage in said district, providing the manner and means for a special assessment to pay for the construction of the sewer in said district,' the following members of the council voted for the passage of said ordinance: First ward, Gunn, Myers; second ward, Earnest; third ward, Curtis, Elliott; fourth ward, Lockard; fifth ward, Whaley, Ritchie; total, 8. The following councilmen voted against the passage of said ordinance: Second ward, Heery. Councilmen absent: Tillotson, of the fourth ward. Eight councilmen voted for the passage of said ordinance, and among them were B. M. Curtis and John Elliott, from the third ward, and E. B. Whaley and Hale Ritchie, from the fifth ward. January 27, 1890, the mayor of the city of Topeka approved said ordinance, and January 30, 1890, the said ordinance was duly published in the official city paper. Of the members of the city council who voted for said ordinance No. 1093, Whaley, Ritchie and Elliott were, at the time they voted for said ordinance, pecuniarily interested in the passage of said ordinance, inasmuch as it omitted large property interests belonging to said councilmen from the burden of building said main sewer; and, without the vote of these three councilmen, a majority of all the members of the city council did not vote for the passage of said ordinance.

"8. The parcel of land or lots shown on the map or profile marked 'Exhibit B,' and designated or marked in yellow color, is the territory now included in sewer district No. 14, as defined by ordinance No. 1093, and all the territory of land or lots on said map or profile marked in blue color on said

map was included in the topographical survey made by the city engineer in obedience to the direction of the mayor and councilmen of the city of Topeka preliminary to the creation of said proposed sewer district No. 14, and were excluded from said district by said ordinance for the purpose of relieving all of the property on said map or profile marked in blue color, including the property belonging to the Whaleys, Ritchies, and Elliott, from paying its just proportion of the assessment necessary for the construction of the said main sewer for district No. 14, and for the purpose of compelling the lots and lands indicated and marked in yellow on said map or profile to pay all the assessments necessary to pay for construcing the main sewer in district No. 14.

"9. All of the land and lots shown on said map or profile marked in blue color were excluded from said sewer district No. 14 by the said ordinance for the purpose aforesaid.

"10. After the passage of said ordinance No. 1093, the mayor and councilmen of the city of Topeka caused the city engineer to make another topographical survey of the territory defined and bounded by said ordinance, and prepare a map or profile, with the plans and specifications for the main and lateral sewers of said district 14, and to make and file an estimate for said work, which map, plans and specifications, so prepared by the city engineer, the mayor and councilmen,

at a meeting regularly had and held, adopted, and approved said plans and estimates of the costs of said work, and caused the city clerk to publish proposals for bids for the construction of said main and lateral sewers. The city engineer, by his estimates, reported to the mayor and councilmen that said work would cost $104,173.15. The red line on said map, commencing at the alley between Lincoln and Buchanan streets, running thence east, thence south, thence east, thence north, thence east, thence north to Thirteenth street to and across the railroad track of the K. N. & D. Rly. Co. and the A. T. & S. F. Rld. Co. track, and thence northerly to connect with the main sewer of sewer district No. 12 at the intersection of Tenth avenue and Adams street, described in conclusion of fact No. 2, shows and represents the line of the main sewer proposed to be constructed and built for sewer district No. 14.

"11. All the territory between Thirteenth and Fourteenth streets and Jackson street and the Kansas, Nebraska & Dakota Railway, marked in blue color on the map above referred

to, is adjoining said main sewer, and should be drained into this main sewer by means of lateral sewers constructed at a comparatively small expense, and is and was before the passage of said ordinance chiefly owned by the said Hale Ritchie and his brother, John Ritchie. .

"12. It is practicable for the mayor and councilmen of the city of Topeka to create a sewer district for the lots and lands marked in blue color on the map between Tenth avenue and Twelfth street, Jackson street and the Kansas, Nebraska & Dakota Railway track, and the sewage could be deposited from lateral sewer pipes into the main sewer of district No. 14, as shown on the map.   This seems to be the only means of carrying off the sewage.   If the territory marked on the map in yellow color is compelled to construct the main sewer for district No. 14, and the territory marked in blue color on said map between Tenth avenue and Twelfth street and Quincy street and the railroad track, and the territory marked in blue color on the map between Thirteenth and Fourteenth streets and Jackson street and the railroad track, should be drained into the main sewer by means of small lateral sewers extending from the main sewer of district No. 14, at a comparatively small expense, then it would save and relieve to the owner of the lots and lands in these two territories marked in blue color the expense of constructing a main sewer to carry away to the river the sewage from this property.

"13. There are and were when this ordinance was passed about 109 houses on the said lots and lands marked on said map in blue color, and nearly all of these houses were used and occupied as residences, and located on the streets and avenues stated in plaintiff's petition.

"14. The mayor and councilmen of the city of Topeka, pursuant to law, appointed appraisers to appraise the real estate, without improvement, situated in said district 14 as defined by ordinance No. 1093, for the purpose of determining how much each lot or piece or parcel of land should pay for making said improvement; and said appraisers returned their appraisement, under oath, into the office of the city clerk, which appraisement is of the aggregate sum of $940,414.

"15. The plaintiff is the owner of 87 lots in said sewer district No. 14, as defined by ordinance No. 1093, situated on Tyler street, Topeka avenue, Harrison street, Fourteenth street, Van Buren street, Huntoon street, and Jackson street, in the city of Topeka; and the said appraisers so appointed, as afore-

said, for the purpose of appraising all of the real estate within said district, as defined by said ordinance, appraised the 87 lots belonging to plaintiff, without improvements, at the sum of $50,700.

"16. There are only two houses situated on the said 87 lots belonging to plaintiff.

"17. The lots, pieces and parcels of land situated in the territory marked in blue color on said map, between Tenth avenue and Twelfth street and Quincy street and the railroad track, and between Thirteenth and Fourteenth streets and Jackson street and the railroad track, marked on said map in blue color, are of about the same value, *without* improvements, lot for lot, as the average of all the lots in the territory marked in yellow on said map and included within district No. 14 as defined in said ordinance No. 1093, *without* the improvements.

"18. In obedience to the directions of the mayor and councilmen of the city of Topeka, the city engineer has prepared plans and specifications for said sewer district No. 14, as defined by said ordinance, for the building of said main and lateral sewers for said district, and presented said plans and specifications to the mayor and councilmen, which have been approved by said mayor and councilmen. The mayor and councilmen of the city of Topeka have caused the city clerk to advertise for sealed proposals for building said main and lateral sewers in said district, and intend to proceed and let the contract for the building of and construction of said main and lateral sewers, as alleged in plaintiff's petition.

"19. January 27, 1890, and for more than one year before that time, the city of Topeka had and was divided into five wards, and at all the times hereinbefore stated there were two councilmen elected, acting, and qualified, in each ward, making in all 10 acting, elected and qualified members of the city council of the city of Topeka, and that said city is and was a city of the first class, organized under the laws of this state.

"20. Hale Ritchie and John Ritchie were, January 27, 1890, large owners of real property in said sewer district No. 14, as bounded and defined by said ordinance No. 1093."

"CONCLUSIONS OF LAW.

"1. Whether or not it is competent for the mayor and councilmen of a city of the first class, by ordinance, to establish a sewer district, with one or more main sewers and lateral sewers, under the law governing such cities, until the city engineer has made and completed a topographical survey of the district

to be drained by such system of sewers, and, when such a topographical survey is made, is it incumbent on and the duty of the mayor and councilmen to adopt the survey, with the boundaries indicated by such survey, or reject the survey as a whole: *Query.*

"2. When a city of the first class is divided into five wards, an ordinance cannot be lawfully passed by the mayor and councilmen unless at least six members of the city council vote for such ordinance, and the vote on the final passage of such ordinance must be taken by yeas and nays, and must be entered on the journal by the city clerk; and when it is shown that in a city of the first class the city is divided into five wards, and that on the passage of an ordinance by the mayor and councilmen for the purpose of creating a sewer district, defining the territory and establishing the boundary thereof, and providing for an entire and complete system of sewerage in said district, and providing the manner and means, and for a special assessment to pay for the construction of the sewer in said district, and it is shown that only eight members of the city council voted for said ordinance, and it is further shown that three of the members of the city council who voted for said city ordinance secured to themselves, directly or indirectly, a pecuniary advantage over the owners of real estate included within the boundaries of the proposed sewer district, such members of the city council are disqualified to vote on the passage of such ordinance, and such ordinance does not pass in the manner required by §109 of the act entitled 'An act to incorporate and regulate cities of the first class, and to repeal all prior acts relating thereto,' approved March 6, 1881, and the acts of the legislature amendatory thereof.

"3. Ordinance No. 1093 entitled 'An ordinance creating sewer district number (14) fourteen, defining the territory and establishing the boundary thereof, and providing for an entire and complete system of sewerage in said district, providing the manner and means and for a special assessment to pay for the construction of the sewer in said district,' approved January 27, 1890, considered and tested by the foregoing conclusions of fact, is unreasonable, (1 Dill. Mun. Corp., 3d ed., §319,) is oppressive, (id., §320,) is partial, (id., §322,) is in contravention of common right, (id., §259,) and is therefore void in law.

"The plaintiff is entitled to a perpetual injunction as prayed. It is further ordered, adjudged and decreed by the court that

the defendant, its officers, agents and servants, be, and they are all of them, enjoined by the injunction of this court from entering into any contract for the construction of the main or lateral sewers under the ordinance of the mayor and councilmen of the city of Topeka, No. 1093, and from making and collecting assessments for the purpose of paying for said sewer under said ordinance; and the court further finds and decrees the said ordinance to be null and void and of no effect.

"It is further ordered and adjudged that the plaintiff have and recover his costs, paid, laid out and expended in this action, taxed at $———.'

The trial court decided that the ordinance establishing the sewer district was an unreasonable one, and that the ordinance was not legally passed, by reason of the affirmative votes of three councilmen in its favor who had a pecuniary interest therein.

I. We will first consider the question of the character of the ordinance. The powers of a municipal corporation are divisible into those general in their nature, power to pass ordinances of specified and defined character, and incidental or implied powers. This division is generic, is universally recognized by text-writers and courts of last resort, and has been frequently applied to control the decision of important controversies. Judge Dillon, in his work on Municipal Corporations, (4th ed., § 89,) says:

"It is a general and undisputed proposition of law, that a municipal corporation possesses and can exercise the following powers: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation not simply convenient, but indispensable."

Among the decisions cited approving this classification of powers are the following: *Cook Co. v. McCrea,* 93 Ill. 236; *City of Ottawa v. Carey,* 108 U. S. 110; *City of Eufaula v. McNab,* 67 Ala. 588; *Henke v. McCord,* 55 Iowa, 378; *Ravenna v. Pennsylvania Co.,* 45 Ohio St. 118; *Bell v. City of Platteville,* 71 Wis. 139; *Gilmore v. City of Milwaukee,* 61 id. 588; *Charleston v. Reed,* 27 W. Va. 681; *City of Kansas v.*

*Swope,* 79 Mo. 446; *City of Portland v. Schmidt,* 13 Ore. 17; *Richmond v. McGirr,* 78 Ind. 192. The ordinance in this particular case was passed by the city council in pursuance of § 19, chapter 37, of the Laws of 1881, that reads:

"The mayor and council shall have power to provide for a system of sewerage and drainage for the city, or any part thereof, and to build and construct sewers or drains by districts or otherwise, as the mayor and council may designate."

The general grant of power is broad enough for all purposes, as expressed in the words "shall have power to provide for a system of sewerage and drainage for the city, or any part thereof," and then comes the discretionary power as expressed in the words that follow, "and to build and construct sewers or drains by districts or otherwise, as the mayor and council may designate." It is said in § 328 of Dillon on Municipal Corporations that—

"Where the legislature in terms confers upon a municipal corporation the power to pass ordinances of a specified or defined character, if the power thus delegated be not in conflict with the constitution, an ordinance passed pursuant thereto cannot be impeached as invalid because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature. In other words, what the legislature distinctly says may be done, cannot be set aside by the courts because they may deem it to be unreasonable or against sound policy."

This section of the text is supported by the cases of *Peoria v. Calhoun,* 29 Ill. 317; *St. Paul v. Colter,* 12 Minn. 41; *Brooklyn v. Breslin,* 57 N. Y. 591; *Coal Float v. Jeffersonville,* 112 Ind. 15; *The State v. Belvidere,* 44 N. J. Law, 350. In the case of *The State v. Clarke,* 54 Mo. 17, Judge Napton says:

"It is naked assumption to say that any matter allowed by the legislature is against public policy. The best indications of public policy are to be found in the legislative enactments. Whether the ordinance in question is calculated to promote the object, is a question with which the courts have no concern when the legislative will has been plainly expressed."

Power to do an act is often conferred upon municipal cor-

porations in general terms without being accompanied by any prescribed mode of exercising it. In such cases, the common council necessarily has, to a greater or less extent, a discretion as to the manner in which the power shall be used. This discretion, where it is conferred or exists, cannot be judicially interfered with or questioned, except where the power is exceeded, or fraud is imputed and shown, or there is a manifest invasion of private rights. (*Railroad Co. v. Evansville*, 15 Ind. 395; *Kelley v. Milwaukee*, 18 Wis. 83; *Slack v. Railroad Co.*, 13 B. Mon. 1; *Bridgeport v. Railroad Co.*, 15 Conn. 475; *Page v. St. Louis*, 20 Mo. 136; *Mayor of Baltimore v. Gill*, 31 Md. 375; *U. P. Rly. Co. v. Cheyenne*, 113 U. S. 516.) Thus, for example, if a city has power to grade streets, the courts will not inquire into the necessity for the exercise of it, or the refusal to exercise it; nor whether a particular grade adopted, or a particular mode of exercising the grade, is judicious. (*Teegarden v. Racine*, 56 Wis. 545; *Sheridan v. Colvin*, 78 Ill. 237; *Hovey v. Mayo*, 43 Me. 322; *Richmond v. McGirr*, 78 Ind. 192.) So, whether we view the delegation of the power contained in this act to the city authorities of Topeka to provide for the construction of sewers by district or otherwise as authority to pass an ordinance of a specified or defined character, or whether we determine that it is a general grant of power, with discretion as to the mode of its exercise — and it must be the one or the other — it is not subject to judicial control upon the ground that it is unreasonable. As a matter of fact, fairly determined by the express words of the statute, it could not be unreasonable because the city council had adopted a system of sewers; and the section expressly provides "that when any property has paid its full proportion for general sewers and drains in one district, it shall not be transferred to any other, and made liable for sewers and drains therein." When, in the course of time, the sewerage system of the city shall be complete by districts, the only possible difference it can make to any or all property-holders would be the time at which they are taxed for the particular improvement. If they could be excluded from a sewer district in which there

was a large population, and left to await the growth and development of a more sparsely settled portion of the city, then sewer taxes would be postponed.  We think the trial court erred in its conclusion of law that the ordinance establishing the sewer district was unreasonable.

II. The query of the trial court, whether or not it is competent for the mayor and councilmen of a city of the first class, by ordinance, to establish a sewer district with one or more main sewers and lateral sewers, under the law governing such cities, until the city engineer has made and completed a topographical survey of the districts to be drained by such system of sewers, and when such a topographical survey is made, is it incumbent on and a duty of the mayor and councilmen to adopt the survey with the boundaries indicated by such survey, or reject the survey as a whole? — may be answered in the negative for a variety of very good reasons: First, the action in question does not make a topographical survey by the city engineer a condition precedent to the action of the mayor and council.  It does not even provide that such a survey shall be made.  Second, the duties of the city engineer are expressly declared by § 89 of the act to be to superintend the construction of all public works ordered by the mayor and council, make out plans, specifications and estimates thereof, and to do the surveying and city engineering ordered by the city council.  Third, it has been repeatedly decided that public powers and trusts are incapable of delegation, and the powers conferred by this act must be exercised by the officers to whom it is delegated by the legislature. (1 Dill. Mun. Corp., § 96.)  Where the charter gives the city council power to construct sewers of such dimensions as may be prescribed by ordinance, the council cannot, by ordinance, require sewers to be constructed of such dimensions as may be deemed requisite by the city engineer. (*St. Louis v. Clemens*, 52 Mo. 133; *Gas Light Co. v. Minneapolis*, 36 Minn. 159; *Matthews . v. Alexandria*, 68 Mo. 115; *Whyte v. Mayor*, 2 Swan, 364.)

III. The city council of the city of Topeka consists of 10 members.  It takes six affirmative votes to pass an ordi-

nance. This ordinance received eight votes, but it is alleged that three members of the council who voted for its passage owned property within and without said sewer district, and were not legally entitled to vote, and hence, receiving only five disinterested affirmative votes, the ordinance was not legally passed. The material facts respecting the ownership of real property by members of the city council who voted for the passage of the ordinance are these: Hale Ritchie, one of the councilmen from the fifth ward, who voted for the passage of the ordinance, was the owner of a large number of city lots on Quincy, Monroe and Madison streets, and on Kansas avenue, and a block lying east of Madison street, south of Eleventh street, west of Jefferson street, and north of Twelfth street. His brother, John Ritchie, owned 31 lots situated on Kansas avenue, Quincy, Monroe and Madison streets. While there is no special finding of fact by the trial court as to what proportion of the real property of Hale Ritchie and John Ritchie is included within this sewer district, we judge from an examination of the maps attached to the record as exhibits, that about one-half of the property of each is included in the sewer district. In this state of facts it is difficult to determine whether, if a disqualification exists as to the affirmative vote of Hale Ritchie as a councilman, on the passage of the ordinance, that disqualification is produced by the property taken into the sewer district, or by that left out. To say in general terms that a member of a city council cannot vote on the passage of an ordinance providing for the construction of some important public improvement, because he owns real property on the street to be graded, in the sewer district to be established, or in the city, when the improvement is a general one, is at once to disqualify every property-owner in the city from belonging to the city council, and committing all the material interests of the city to a class of persons who have no property rights to protect. This would be going too far. Our statutes have provided, in ¶ 653, page 230, General Statutes of 1889:

"It shall be unlawful for the mayor or any member of the council, or any elected or appointed officer or servant of the

city, to be a party to or interested pecuniarily in any contract, job or piece of work which may be let by the city; and any contract in which any such officer shall be pecuniarily interested shall be null and void; and in case any money shall have been paid on any such contract, it shall be the duty of the city attorney to sue for and recover the amount so paid, in the name of the city, from the parties to such contract, and from the councilman or other officer pecuniarily interested in the same; and if any such officer, while in office, shall become pecuniarily interested, directly or indirectly, in any contract or agreement in which the city shall be interested, or in any questions submitted, or proceedings upon which such officer shall be called upon to vote or act officially, with intent to gain, directly or indirectly, pecuniarily, any benefit, profit or pecuniary advantage, he shall be removed from office, and on conviction shall be deemed guilty of a misdemeanor," etc.

This section prohibits a member of the city council from voting on any question submitted, or in any proceeding, with intent to gain, directly or indirectly, pecuniarily any benefit, profit, or advantage. Assuming that this section applies in letter and spirit to Hale Ritchie in his vote on the ordinance in question, yet we are not able to determine from the facts recited that his affirmative vote cast in favor of the passage of this ordinance was cast with intent to gain any profit or advantage. If Ritchie was prosecuted under the section above quoted for misdemeanor, or if proceedings had been commenced to remove him from office as a councilman on the facts presented in this record, could it be pretended for a moment that a guilty intent was shown? The theory of the defendant in error, if applied to the extent claimed, would practically disfranchise every member of the council who owned real property. Section 444, Dillon on Municipal Corporations, (3d ed.,) and the case of *City of Toronto v. Bowes*, 4 Grant, (U. C.) 504, are cited to sustain the views of the defendant in error. The citation from the admirable work of Judge Dillon is to the effect that "Members of a municipal board are disqualified to vote therein on propositions in which they have a direct pecuniary interest *adverse to the municipality they represent.*" This is the extent to which the text applies. In

support of it, the foot-note cites the cases of *Oconto Co. v. Hall,*
47 Wis. 208; *Pickett v. School District,* 25 id. 551; *Coles v.
Williamsburgh,* 10 Wend. 659; *Walworth Bank v. F. L. & T.
Co.,* 16 Wis. 629; *United Brethren Church v. Vandusen,* 37
id. 54; *Steckert v. East Saginaw,* 22 Mich. 104. The latter
case is similar to the one under consideration. It was an in-
junction to restrain the collection of a special assessment for
paving a street. One of the grounds alleged was, that two of
the aldermen who formed a part of the quorum when impor-
tant action was taken, and without whose presence and votes
there would have been no quorum, were petitioners for the im-
provement and owners of property liable to assessment therefor.
The votes of these aldermen, it is claimed, were void, and
consequently the action of the council to which their votes
were essential was void also. Judge Cooley, who delivered
the opinion of the court, said:

"We think this objection without force. The action in
question was legislative in character, and the interest these
aldermen had in it was of precisely the same nature with that
which every legislator has in a bill he votes for, which is to
subject his property, in common with that of his fellow-citi-
zens, to taxation. They were laying down rules which, in
their operation, would affect alike and impartially their own
interest and that of all others whose property would be taxed.
Such an interest is calculated to make a man careful and so-
licitous for the public interest with which his own is insepar-
ably connected, instead of inclining him to vote recklessly or
corruptly, when the burdens are to follow which he must
share. None of the cases cited on the argument in this con-
nection have any bearing. Those only decide that a man is
not permitted to occupy inconsistent positions when his own
interest is directly involved, but in no question here voted
upon could these aldermen have discriminated between their
personal interest and that of the other tax-payers, except in
fixing the taxing district, and as on that question, if they
voted at all, it was against their apparent interest and in favor
of making a district that included their own property, it is
obvious that they did not, by their vote, place themselves in
a position antagonistic to other tax-payers. If the common
council acted as commissioners of apportionment in making

the assessment upon the property that was to bear the burden, other considerations might be involved, but this charter designates a different tribunal for that purpose, and prescribes great caution to insure impartiality."

This comes very close to the action of Ritchie as a councilman. He had a large number of lots included in this sewer district. The other cases cited are to this effect: The case in 47 Wis. 208, applies to two members of a board of county supervisors who voted in favor of a compromise settlement with a defaulting county treasurer, in a case in which they were personally responsible for some of the missing money. In the case in 16 Wis. 629, the general rule of the common law, that members of a legislative or a municipal body are disqualified to vote on propositions in which they have a pecuniary interest *adverse to the state or municipality they represent*, was applied to an officer of a railroad company. In *United Brethren Church v. Vandusen*, supra, it was applied to the trustees of a church society. In *Pickett v. School District*, supra, it was applied to a school-district officer. In the case of *Coles v. Williamsburgh*, 10 Wend. 659, the same principle was applied to a village trustee. We would apply it in this case against Councilman Ritchie, if it was shown that he had a pecuniary interest in the establishing of this sewer district adverse to the city of Topeka. Viewing it from every stand-point, we cannot say that Ritchie was disqualified by reason of the fact that some of his property was included in and some excluded from the sewer district. His vote made the necessary majority, and the ordinance was legally passed. It is not necessary to comment on the votes of the other councilmen. The property included in the sewer district is specially benefited, and it is true that other property might have been taken in and received special benefits. This may be said in every case of the establishment of a sewer district, but because the city council, in the exercise of the power and discretion conferred upon it by law, has included some and excluded some, we cannot say as a matter of law, based upon the exclusion, that the ordinance is void, for

2. Councilman —voting— disqualification. without a clear showing that there has been corrupt and fraudulent action by councilmen, we cannot review their proceedings in such a matter. Our conclusion is, that upon the facts recited in the record, there has not been a sufficient showing upon which to predicate a judgment either that the ordinance is void, or that Ritchie was disqualified from voting. It is true in this case, as in every other sewer district that may be established, that there is adjoining its boundaries some outlying property that might be benefited by the sewer, and we have no doubt but that the property lying inside the boundaries of this particular sewer will receive benefits from its construction, but because these results are plain, it does not follow that all property that may be benefited by the construction of sewers should all be embraced within one sewer district. The legislature has left this matter to the control of the mayor and councilmen of the city of Topeka, and in no case would we interfere, except upon clear proof of actual fraud. All questions of public policy with reference to sewers have been considered and determined by the legislature of the state, and as long as the proceedings of the city council are in accordance with the express grant of power of the legislature, and the personal conduct of the members thereof, with respect to their official action 1. Sewer district —fraud—judicial interference. in such matters, are not fraudulent, we find no warrant of authority to interfere, or subject the establishment of sewer districts to judicial interference.

Recent opinions of this court, filed at the January sitting, in the cases of *City of Atchison v. Price, City of Atchison v. Lamphear,* and *City of Atchison v. Burnes Estate,* 45 Kas. 296, will be found to have some bearing on the propositions herein discussed.

It is recommended that the judgment of the district court be reversed, and the cause remanded, with instructions to refuse the order of injunction.

By the Court: It is so ordered.

All the Justices concurring.